*In re* LE

Docket Nos. 276924 and 276925. Submitted November 6, 2007, at Detroit. Decided February 12, 2008, at 9:00 a.m.

The Department of Human Services filed a complaint and a petition in the Oakland Circuit Court, Family Division, seeking to have the court take jurisdiction over LE (the minor daughter of Earl D. Davis and Karen D. Jordan), and JL, JB, BG, also known as T, KL, and TS (the minor children of Karen D. Jordan). Following a series of hearings, the filing of supplemental petitions seeking termination of parental rights, and an adjudication trial, the court, Eugene A. Moore, J., entered an order terminating Earl Davis's parental rights to LE and Karen Jordan's parental rights to all of her minor children. Earl Davis and Karen Jordan appealed separately from that order, and their appeals were consolidated.

The Court of Appeals *held*:

1. With regard to Earl Davis, the trial court did not err as a matter of law in exercising jurisdiction over LE, the Department of Human Services did not breach any statutory duty to assist Davis and provide services to him, and the trial court did not err in finding clear and convincing evidence of statutory grounds for termination and in considering the actions of Davis that occurred before he perfected paternity with regard to LE late in the proceedings. The court did not clearly err in failing to find that termination of Davis's parental rights would be clearly contrary to LE's best interest.

2. With regard to Karen Jordan, the trial court did not clearly err in finding clear and convincing evidence of statutory grounds for termination and that termination of her parental rights was in the children's best interests.

Affirmed.

1. PARENT AND CHILD — TERMINATION OF PARENTAL RIGHTS.

The services that the Department of Human Services provides in making reasonable efforts to rectify the conditions that led to its involvement in actions to terminate parental rights and to seek to

reunify families must be provided to a parent, but not to a putative parent (MCL 712A.18f; MCL 712A.19[7]; MCL 712A.19b [5]).

2. PARENT AND CHILD — CHILD PROTECTIVE PROCEEDINGS — WORDS AND PHRASES — PARENT — FATHER.

A "parent," for purposes of child protective proceedings, is the mother, the father, or both, of the minor; the "father" is a man who was married to the mother at any time between the minor's conception and birth, who legally adopts the minor, who is judicially determined to be the father by order of filiation or judgment of paternity, who is judicially determined to have parental rights, or whose paternity is established by filing an acknowledgment of paternity in accordance with the Acknowledgment of Parentage Act (MCL 722.1001 *et seq.*; MCR 3.903 [A][7] and [17]).

3. PARENT AND CHILD — PUTATIVE FATHERS — TERMINATION OF PARENTAL RIGHTS.

The conduct of a father before the father perfects paternity of a minor may provide a basis to establish the statutory grounds to terminate the father's parental rights.

*David G. Gorcyca*, Prosecuting Attorney, *Joyce F. Todd*, Chief, Appellate Division, and *Danielle Walton*, Assistant Prosecuting Attorney, for the Department of Human Services.

*Cathy A. Greenberg*, Guardian Ad Litem, for LE.

*Karen Gullberg Cook* for Earl D. Davis.

*Lee A. Somerville* for Karen D. Jordan.

Before: WILDER, P.J., and CAVANAGH and FORT HOOD, JJ.

PER CURIAM. In Docket No. 276924, respondent Earl Dwayne Davis appeals as of right the trial court's order terminating his parental rights to LE, under MCL 712A.19b(3)(g) (failure to provide proper care and custody). In Docket No. 276925, respondent Karen Deneise Jordan (the mother) appeals as of right the same order

terminating her parental rights to LE, and also to JB, TS, JL, KL,[1] and BG, also known as T,[2] under MCL 712A.19b(3)(c)(*i*) (conditions that led to adjudication continue to exist), and (g) (failure to provide proper care and custody).[3] The parental rights of Davis were terminated for failure to provide proper care, because he did not formally establish paternity until LE was approximately a year and a half old. Respondent mother's parental rights were terminated because she failed to attend court-ordered drug screens consistently and failed to obtain suitable housing. We affirm.

## I. FACTS AND PROCEDURAL HISTORY

The children were taken into foster care on February 23, 2005, while the mother was in the hospital after LE's birth. The complaint by petitioner Department of Human Services (DHS) alleged that LE tested positive for cocaine at birth, and that TS and BG had also been born with cocaine in their systems. Davis later testified that he was on "the streets" from March to June 2005, and did not initially know about LE. Davis also later admitted that he had a substance-abuse problem at the time LE was born, and that he used drugs since he was 13 years old, drank daily, and used cocaine two or three times a month since he was 18 or 20 years old. Davis had convictions in Arkansas dating from 1992 to 1997. In 1994, Davis received a gunshot wound to the stomach, resulting in his receiving $625 a month in disability

---

[1] KL was born in 1998. The petition erroneously states 1999.

[2] Her name was never officially changed from BG to T.

[3] The trial court also terminated the parental rights of JL's father, who has not appealed. The trial court did not terminate the parental rights of TS's father, finding that it was not in TS's best interest, or the parental rights of JB's father, finding no statutory basis for termination. The alleged father of KL and TS consented to the termination of his parental rights.

benefits. Davis had several Michigan convictions, for misdemeanors and felonies, from 1997 and 1998.

The agency's complaint alleged that the mother had no income, except $300 a month in child support; that the home was dirty, had no heat or electricity, and there was minimal food; and that the children were wearing dirty clothes and sleeping on dirty sheets on the living room floor. The mother had received various services in the past from the agency, including substance-abuse treatment, when two of her older children (not part of this case) were left home alone and burnt the house down while playing with matches.

On February 24, 2005, a preliminary hearing was held. Davis did not attend. But his mother, LE's paternal grandmother, Reena Mae Williams, did attend this hearing, indicating that she wanted to have LE placed in her home, but that she had been unable to locate Davis to sign an affidavit of paternity. The mother was granted visitation and ordered to submit to random drug screens.

On March 23, 2005, a pretrial conference was held. Davis attended, indicating that he wished to become LE's legal father. The mother confirmed that Davis was LE's biological father. The court then instructed Davis to take further action:

> At this point in time the Court takes the position that you do not have standing to be represented by counsel here, to be a party in this action as you are the putative father. *But if you were to take direct action to be made the legal father of this child by filing for paternity in this case, and if you're found to be the legal father, the Court will have you made a party* and you will be represented by counsel. *You are to perfect paternity with regard to [LE] within 14 days of today. So you can discuss this with the FIA after today's hearing as to what steps you should take.* [Emphasis added.]

The court clarified that, because the mother stated that she was certain that Davis was the father, it was not ordering a paternity test, and that an affidavit of parentage, executed by the mother, would suffice.

At the March 2005 hearing, the mother pleaded no contest with regard to the allegations in the complaint. The court ordered psychological evaluations of the mother and the children who were over six years old, and continued the mother's random drug screens. The mother attended a psychological evaluation on May 12, 2005.

On May 23, 2005, a dispositional hearing was held. Davis did not appear. The mother signed a parent-agency agreement, requiring her to complete a substance-abuse program, continue random drug screens, obtain employment and suitable housing for all six children, and complete parenting classes. The court warned the mother that the evaluator was skeptical of her ability to remain drug-free, and that showing that she could do so was the most important goal.

On May 25, 2005, the mother's drug screen was positive, so her next visitation of the children (on June 3) was canceled. Sometime in June 2005, Davis was arrested for felonious assault. Later, he was convicted. Sometime in 2005, Davis was also convicted of retail fraud.

On June 3, 2005, another dispositional hearing was held. Davis did not appear. The court noted that it had instructed Davis to perfect paternity within 14 days, and that Davis had not done so. The court asked petitioner to contact Davis and determine whether he intended to perfect paternity, otherwise his rights to LE "may be cut off."

During a period in 2005, the mother submitted to drug screens during substance-abuse treatment at the

PRISM program of Oakland County Family Services. In August 2005, the mother was referred to another drug-testing center, Jail Alternatives for Michigan, Services, L.L.C. (JAMS), for follow-up random screens. Also during August 2005, a new caseworker, Mandy Ryals, was assigned to the case, although the original case-worker, Lauren Hughes, apparently continued to work on the case at times.

On August 16, 2005, the mother ceased attending random drug screens. On August 29, 2005, a permanency planning hearing was held. It was reported that JB, JL, TS, and KL all had some behavioral issues and were in therapy. Another of the mother's visitations was canceled because of her failure to attend the substance-abuse program for three days (thus also missing her drug screens). The mother was referred for weekly random drug screens. She asked to be ordered to attend alcoholics anonymous/narcotics anonymous (AA/NA) meetings, to motivate her to go to her drug screens. The mother was supposed to begin working at McDonald's.

In September 2005, the mother told Hughes that Davis had been arrested. Hughes attempted to locate Davis on the offender tracking information system, but was unsuccessful.

In the beginning of October, the mother's visitations were suspended when Hughes learned of her failure to submit to drug screens since August 16, 2005. Visitations did not resume until January 2006, contingent on the mother's obtaining three negative drug screens.

On November 28, 2005, a dispositional hearing was held, which neither the mother nor Davis attended. The mother had provided verification that she was employed at a home health care agency. But she had not submitted to any random drug screens since October 10, 2005. The mother had also been inconsistent in

seeing her therapist, attending only one session in November 2005, and had been dropped from the program.

On January 30, 2006, a permanency planning hearing was held, which the mother attended. No one had heard from Davis. The mother still did not have housing. Nonetheless, the agency asked for another 60 days to give her an opportunity to comply with the new drug-screen schedule. The court agreed, but warned the mother that it would "be looking very closely at what you do during the next two-month period."

On March 30, 2006, a review hearing was held at which Davis did not appear. The court noted that there had been no adjudication concerning Davis, but that one was not required. The mother appeared. Hughes noted that the mother had failed to appear for drug screens on February 7, 10, 18, and 23, 2006. The mother had lost her job because she stopped appearing for work, and her last day of work was February 2, 2006. The counseling report indicated that from December 17, 2005, to February 26, 2006, the mother had failed to attend five out of seven therapy sessions. The caseworker recommended a termination petition, and the court stated that one could be filed, but did not order the agency to do so. The court warned the mother that "if there is not close to perfect compliance we're likely looking at a situation where the Court is going to order that a petition be filed." The court warned the mother that she could not miss the drug screens.

In April or May 2006, the mother moved in with her sister, within walking distance of the JAMS drug-testing center. Nonetheless, the mother continued to miss some drug screens.

On June 9, 2006, a permanency planning hearing was held, at which the mother appeared. Davis did not

appear. There had been no contact with Davis, and termination was recommended on the grounds of abandonment. The mother had missed almost half of her random weekly drug screens, on April 14 and 16, and May 19 and 21, 2006, with only one absence excused. The mother had also missed two parenting classes. The caseworker concluded that the mother had made little overall progress, and recommended that a termination petition be filed. The court agreed, and ordered a petition to be filed.

On July 12, 2006, the caseworker informed the mother that, because she had missed two drug screens, the agency was suspending visitations with the children. Nevertheless, the mother failed to appear for the next two drug screens.

Sometime in August 2006, Davis got out of jail. He then entered an inpatient substance-abuse treatment program. (This would last till October 2006.) While an inpatient, Davis had telephone privileges and could have written letters (for instance, he completed job applications). The program report states that Davis was not strongly motivated for treatment.

Sometime in August 2006, Hughes contacted the paternal grandmother to ascertain the whereabouts of Davis, and learned that he was in the inpatient program, so she attempted to contact him there. But the program's staff would not confirm that Davis was there without a release. Thereafter, the grandmother attempted to maintain frequent contact with Hughes, who informed her of the next hearing date and asked her to tell Davis.

On August 15, 2006, the agency sent a notice to Davis stating that his failure to appear at the next hearing would be considered a waiver of any further notice and of the right to counsel, and could result in the termina-

tion of his parental rights. On August 20, 2006, the agency filed a supplemental petition for termination of the mother's parental rights.

On August 21, 2006, a pretrial/review hearing was held. Davis appeared, as did the mother. Before the hearing began, Davis signed an affidavit of parentage, formally acknowledging paternity of LE. The mother had missed four drug screens since the last hearing. The court continued the suspension of visitation.

On September 12, 2006, the agency filed an amended petition, stating that Davis had now established paternity, and alleging grounds for terminating his parental rights. On September 19 and 29 and November 1, 2006, termination hearings were held. The portion of the hearing pertaining to Davis was adjourned until November 6, 2006.

At the termination hearings, the following testimony was adduced. The mother admitted that she was an alcoholic, and that she used crack cocaine, powder cocaine, and marijuana for approximately 20 years. She admitted that despite being ordered to attend AA/NA meetings, she attended only a few times. She admitted that she still struggled with her addiction. The testimony adduced indicated that from August 2005 to June 2006, the mother failed to appear for more than half (31 of 56) of the random drug screens. The mother was working at Costco about 30 hours a week, earning about $600 a month. The mother admitted that she had two outstanding bench warrants, for driving with a suspended license and disobeying a traffic signal.

On October 29 and 30, 2006, the mother tested positive for cocaine. Sometime in November 2006, Davis was paroled. Sometime in 2006, Davis was convicted of possession of a firearm by a felon. It is unclear whether he served time in jail for this conviction. There is

testimony indicating that as of the November 6, 2006, trial date (see below) Davis had only been out of jail one week.

On November 6, 2006, Davis's initial adjudication trial was held. Hughes testified that Davis had not had any contact with LE, or with the agency, since LE was placed in foster care in February 2005. He did not establish paternity until August 2006. The caseworker was aware of Davis's identity since March 2005 (when the court instructed Davis to take further action to establish paternity). The caseworker testified that the affidavit of parentage, the form for establishing paternity, was available at the agency's office, as well as online, and that a parent can simply mail it to the address listed on the back. The caseworker testified that neither Davis, nor anyone on his behalf, contacted the agency for assistance in establishing paternity.

At the November 6, 2006, initial adjudication trial for Davis, Hughes testified that she knew that Davis was the putative father and that she periodically made efforts to contact him through the mother. The mother told Hughes that she had asked Davis to call Hughes, but he never did.

Hughes acknowledged that the agency did not attempt to "reunify" LE with Davis because Davis had not established paternity. Hughes testified that parent-agency agreements are not usually created for putative fathers, but that if Davis had contacted the agency, one would have been created.

Davis admitted using drugs since he was 13 years old, and drinking daily. He admitted using cocaine two or three times a month since he was 18 or 20 years old, and that when LE was born, he had a substance-abuse problem. Davis claimed that at the time of trial, November 2006, he had been sober for 15 months. Davis

admitted that he was on "the streets" when LE was born, and did not know about LE until she was placed in foster care. Davis admitted that he had no housing from March until June 2005, when he was arrested.

At the November 6, 2006, adjudication trial, Davis testified that there were several reasons why he did not acknowledge paternity in writing sooner. For instance, while he admitted that he appeared at the March 2005 court hearing and acknowledged paternity verbally, he claimed "no one told me about all this." He stated that he did not know anything about how to get affidavits, and that no one talked to him about this subject. Davis claimed that he did not hear the court tell him to perfect paternity within 14 days. He admitted that, later, the mother told him "how to go do it, whatever the papers or something I had to sign," but he testified that after he was arrested in June 2005, he lost contact with the mother when she moved. Davis testified that he wrote the mother two letters from jail, approximately a year apart. Davis testified that he asked the mother to bring him the papers, but she never did, so Davis "left it at that." He testified that he "didn't know [any]thing about going to [any]body else about the papers."

Davis testified that he knew that his mother (LE's paternal grandmother) had driven the mother to one of the visits. Davis testified that his mother told him he could not visit LE. She asked him whether he would be getting custody of LE, and he responded, "[Y]es, if they ever come to me with her." Davis testified that the mother told him that he could not visit LE, "because I didn't get some papers or something. She said I lost my rights or something like that." He testified that he did not know how to regain his rights, and that he did not provide support for LE because he was in jail. Davis admitted that he could have used the telephone in jail if

he had the money to pay for the calls, claimed that he did not know about the agency, and admitted that the mother told him about one of the court dates when he was in jail.

On November 13, 2006, the trial court held a review hearing. A new caseworker, Sherry Pullins, reported on how the children were doing. The trial court then issued a decision. It found that the mother and Hughes were very credible witnesses, that Davis was generally credible, but that the parents did not dispute much of Hughes's testimony.

The trial court found that the mother failed to provide proper care and failed to rectify the conditions that placed the children in foster care. The court noted that the mother had missed an extensive number of drug screens, that the mother admitted that two of the children tested positive for cocaine at birth, and that part of her reason for missing drug screens was her continuing struggle with her addiction. Thus, the court found that the mother failed to fully address the central problem in the case. The court also found that the mother failed to provide consistent proof of employment for significant periods and failed to obtain adequate housing. The court found that there was no reasonable expectation that the mother would be able to provide proper care within a reasonable time.

Concerning Davis, the trial court noted that he had failed to perfect paternity until late in the proceedings, in part because he was in jail. After conducting research, the trial court concluded that it could terminate Davis's parental rights despite his failure to perfect paternity until late in the proceedings. The trial court considered Davis's testimony that he did not know how to perfect paternity, but found that, on the basis of the evidence presented at trial, there were grounds to

terminate his parental rights for failure to provide proper care. In particular, the court found that Davis had a lengthy criminal record, and was living on the streets at the time of LE's birth. The trial court concluded that there was no reasonable expectation that Davis would be able to provide proper care within a reasonable time, considering LE's age. The court ordered psychological evaluations of Davis and the children, except for LE, in preparation for the best-interests hearing, indicating that it would consider the evaluations and testimony at that hearing very carefully.

On December 14, 2006, a new foster-care worker, Jill Pranion, took over the case. Davis did not appear for his psychological evaluation. On January 29, 2007, the mother attended her evaluation.

On February 2, 2007, the court held the best-interests hearing. The court took judicial notice of the file and admitted the psychological evaluation of the mother.

Pranion testified that she had provided weekly therapy to KL since June 2005, and to JL and BG since July 2005, and continued to see all three. Pranion testified regarding the children's behavioral and mental-health problems. But Pranion testified that LE, the only child removed from the mother's care at birth, had no special needs.

Pranion concluded that the mother benefited only minimally from substance-abuse treatment. Since August 2006, the mother had missed six drug screens and tested positive for cocaine twice in October 2006. Pranion testified that the mother never obtained suitable housing for the children and was now staying at two addresses. Pranion testified that she believed that the mother's therapy sessions were being canceled because

of noncompliance. Pranion opined that in the long run, termination would benefit the children, because they would be able to achieve stability, and that the children needed to be able to move on, given that the case had been open for two years. Pranion opined that the mother did not earn enough money and did not have a large enough support system to be able to provide housing and proper care to the several children, especially given that most of them have special needs. Pranion testified that there were no further services that could be offered to the mother, and that her parental rights should be terminated so that the children can achieve stability.

Concerning Davis, Pranion testified that the agency does not offer visitation or services to putative fathers; that Davis never provided documentation of obtaining suitable housing or attending parenting classes; that there would be no harm to LE from termination because LE never had a relationship with Davis; that, to the contrary, LE would be harmed by "reunification," because bonding with Davis would require a huge process of adjustment and would be difficult emotionally, and that termination was in LE's best interest. Pranion testified that she had had no contact with Davis and that she did not know of his plan for LE to be placed with his mother or that he had other children who were doing well.

At the February 2, 2007, best-interests hearing, Davis testified that his 15-year-old daughter is healthy and happy, and has no problems, and that his 14-year-old son is the same way. Davis testified that he talks to those two children daily to make sure they go to school daily and do not get into drugs, and they listen to him. He testified that his plan is for LE to live with him at his mother's house, which has six bedrooms; that he lives

there with his parents and one of his brothers; and that aside from himself, no one in that home has a criminal record or involvement with the agency.

Davis further testified that if he had known how to file an affidavit of paternity sooner, he would have done so; that no one explained that he might lose his parental rights; and that he would have done whatever such a person would have asked him to do. He testified that he has helped to care for his other two children all their lives, including helping them financially, using his disability benefits and money his mother gave him. He acknowledged that he does not work. He testified that he goes to the house of the mother of his two older children and cares for them while she works.

Davis testified that he was on parole until November 2007, and attends substance-abuse counseling weekly; that he has missed a few appointments with his parole counselor; that he does not have transportation; and that he missed the first psychological evaluation because he did not have a ride, and missed the second evaluation because his identification was in his mother's car. He admitted that he never visited or supported LE; that he initially had doubts about his paternity of LE, but not anymore; and that when he was in jail, he did not call the mother.

On February 9, 2007, the trial court announced its decision to terminate the parental rights of the mother and Davis. The court found that, given the mother's continued failure to submit to drug screens and her two positive drug screens, her compliance with the parent-agency agreement had been minimal and she had not fully benefited from the services provided; and that the mother's long history of drug abuse, problematic behaviors, and instability outweighed any recent gains. The court concluded that termination of the mother's pa-

rental rights would not be clearly contrary to the best interests of the children but, rather, that termination was in their best interests.

Concerning Davis, the court noted his failure to submit to a psychological evaluation and that it took him 17 months to perfect paternity after being told to take action. The court noted that Davis had a significant criminal history and no relationship with LE and, therefore, termination would have no effect on LE. The court concluded that the evidence did not support a finding that termination of Davis's parental rights would be clearly contrary to LE's best interest and found that termination instead was in LE's best interest.

## II. LAW AND ANALYSIS

### A. DAVIS'S CLAIMS ON APPEAL

Davis argues that: (1) DHS failed to prove by a preponderance of the evidence that LE fell under MCL 712A.2(b) on the basis of Davis's actions before the time he perfected paternity and thus had a legal duty to LE; (2) DHS failed to comply with its statutory duties to assist Davis and provide him with services; (3) the trial court erred by finding that clear and convincing evidence had been presented regarding the statutory ground for termination under MCL 712A.19b(3); and (4) it was not in LE's best interest to terminate his parental rights.

1

Davis first argues that the trial court erred in asserting jurisdiction over LE on the basis of actions he took before perfecting paternity, when he had no legal duty toward the child. We disagree.

The circuit court's jurisdiction in termination proceedings is derived from statutes and the constitution. *In re Hatcher*, 443 Mich 426, 433; 505 NW2d 834 (1993); see also MCL 712A.2(b)(2). To determine "whether a child falls within the juvenile court's jurisdiction," the court must make "a finding of probable cause to substantiate that the facts alleged in the petition are true and that if proven at trial would fall under subsection (b)(2)." *Hatcher, supra* at 433, 435. On appeal, questions of statutory interpretation are reviewed de novo, while findings of fact are reviewed for clear error. *In re S R*, 229 Mich App 310, 314; 581 NW2d 291 (1998).

Once the family court acquires jurisdiction, it may take measures " 'against any adult.' " *In re CR*, 250 Mich App 185, 202; 646 NW2d 506 (2002), quoting former MCR 5.973(A), now MCR 3.973(A). The court need not separately ascertain whether it has jurisdiction over each parent. *In re CR, supra* at 202-203.

The trial court acquired jurisdiction over LE on the basis of the mother's no contest plea to the allegations of the original petition. Davis was present at that hearing on March 23, 2005. However, at that time, he had not perfected paternity and counsel had not been appointed to represent him.

Because the court had already exercised jurisdiction over LE on the basis of the mother's plea, it had no obligation to treat the September 2006 supplemental petition (seeking termination of Davis's parental rights) as an original petition, or to independently determine whether it had jurisdiction over LE on the basis of Davis's actions. Nonetheless, the court did so. The court found that Davis's criminal history and lack of housing at the time of LE's birth were sufficient for the court to take jurisdiction under the neglect statute, MCL 712A.2(b)(1) and (2).

Because the court already had jurisdiction over LE, its findings concerning jurisdiction over LE on the basis of Davis's actions were superfluous. See *In re CR, supra* at 202-203. Thus, this Court need not reach the issue whether a court may consider conduct by a putative father before perfecting paternity as a basis for jurisdiction.

2

Next, Davis argues that DHS failed to comply with its statutory duties to assist him and provide him with services. We disagree.

In termination cases, the trial court's findings of fact are reviewed for clear error and may be set aside only if, although there may be evidence to support them, the reviewing court is left with a definite and firm conviction that a mistake has been made. MCR 3.977(J); *In re Conley*, 216 Mich App 41, 42; 549 NW2d 353 (1996). Due regard is given to the trial court's special opportunity to judge the credibility of witnesses. *In re Miller*, 433 Mich 331, 337; 445 NW2d 161 (1989). Questions of statutory interpretation are reviewed de novo. *In re S R, supra* at 314.

In general, petitioner must make reasonable efforts to rectify conditions, to reunify families, and to avoid termination of parental rights. See *In re Terry*, 240 Mich App 14, 25-26; 610 NW2d 563 (2000); MCL 712A.18f; MCL 712A.19(7); see also MCL 712A.19b(5). However, these statutory provisions require that services be provided to *a parent*, not to a putative parent.

For example, MCL 712A.18f(3)(c) requires that the case service plan identify the efforts to be made by the agency to return "the child *to his or her home*." (Emphasis added.) MCL 712A.18f(3)(d) requires that the case service plan contain a "[s]chedule of services to be

provided *to the parent,* child, and if the child is to be
placed in foster care, the foster parent, to facilitate the
child's return *to his or her home* or to facilitate the
child's permanent placement." (Emphasis added.) MCL
712A.19(7) addresses the court's ability to order ser-
vices as part of the case service plan. Lastly, MCL
712A.19b(5) states that, upon finding grounds for ter-
mination, there will be no "additional efforts for reuni-
fication of the child with *the parent . . . .*" (Emphasis
added.)

In child protection proceedings, MCR 3.903(A)(17) de-
fines a "[p]arent" as "the mother, the father as defined in
MCR 3.903(A)(7), or both, of the minor." Under MCR
3.903(A)(7), a "[f]ather" is a man who (1) was married to
the mother at any time between the minor's conception
and birth; (2) legally adopts the minor; (3) is judicially
determined to be the father by order of filiation or
judgment of paternity; (4) is judicially determined to have
parental rights; or (5) *whose paternity is established by
filing of an acknowledgment of paternity* in accordance
with the Acknowledgment of Parentage Act, MCL
722.1001 *et seq.* Thus, in the present case, until Davis
perfected legal paternity, he was not a "parent."[4] There-
fore, Davis was not entitled to services before establish-
ing paternity on August 21, 2006. However, Davis
argues that he was entitled to begin receiving services
*after* he established legal paternity.

MCR 3.921(C) addresses a putative father's right to
notice. Here, oral notice was provided to Davis at the
beginning of these proceedings, and he appeared on
March 23, 2005, and was determined to be the natural

---

[4] The prosecutor notes that MCL 712A.18f(1)(b) allows DHS to justify
its decision not to provide services before removal. However, because LE
never lived with Davis and was not removed from his care, that section
does not apply in this case.

father, in accordance with MCR 3.921(C)(2).[5] He was then ordered to establish legal paternity within 14 days in accordance with MCR 3.921(C)(2)(b). He failed to do so.

MCR 3.921(C)(2)(b) states that "[t]he court may extend the time [for establishing paternity] for good cause shown." *Id.* Alternatively, MCR 3.921(C)(3)(b) provides:

> The court may find that the natural father waives all rights to further notice, including the right to notice of termination of parental rights, and the right to an attorney if
>
>                \*   \*   \*
>
> (b) he appears, but fails to establish paternity within the time set by the court.

In the present case, Davis appeared and was instructed to perfect paternity within 14 days. He did not do so, and the case proceeded for 17 months without his participation. At any hearing during those 17 months, the court could have found that, under MCR 3.921(C)(3), Davis had waived all rights to further notice and the right to an attorney. Instead, the court sent Davis an SCAO[6] form notice, dated August 15, 2006, summarizing the provisions of MCR 3.921(C)(2) and (3), discussed above. On August 21, 2006, Davis appeared and was permitted to formally establish legal paternity.

---

[5] The mother was never married during her pregnancy and, therefore, LE had no legal father. See MCR 3.903(A)(7). Thus, in March 2005, the court properly determined by a preponderance of the evidence that, on the basis of the mother's and Davis's representations, Davis was LE's biological father. See *In re KH*, 469 Mich 621, 629 & n 11; 677 NW2d 800 (2004); see also MCR 3.921(C)(2)(b).

[6] The SCAO is Michigan's Supreme Court Administrative Office.

The provisions of the court rule are clear. The court was not required to allow Davis to perfect paternity beyond the 14-day period, unless good cause for the delay was shown. Until August 21, 2006, when he perfected paternity, Davis was only a putative father and the agency never had the goal of "reunifying" LE with him. We find no provision of law requiring the agency to begin to provide him with services 17 months after he was instructed to perfect paternity, when he finally chose to participate in these proceedings. An amended petition to terminate his parental rights was filed on September 12, 2006,[7] clearly indicating that petitioner did not have "reunification" as its goal for LE. Services need not be provided where reunification is not intended. See MCL 712A.18f(1)(b) (agency may explain why services were not provided). Further, Davis was incarcerated or in inpatient drug treatment until late October 2006 and could not have participated in services. We find no record support for his claim that race or economic status played a role in petitioner's decision not to provide him with services.

Davis now claims that petitioner never explained what he was supposed to do. We disagree. On March 23, 2005, the court unequivocally told Davis to take further action, and to consult the agency regarding steps he should take. Davis must take responsibility for his own failure to follow the court's instruction. Petitioner did not breach any statutory duty.

3

Next, Davis argues that the trial court erred by finding that clear and convincing evidence had been

---

[7] The original termination petition, filed on August 10, 2006, does not mention Davis and does not seek to terminate his parental rights.

presented regarding the statutory ground for termination under MCL 712A.19b(3). We disagree.

The existence of a statutory ground for termination of parental rights must be proven by clear and convincing evidence. MCR 3.977(F)(1)(b) and (G)(3); *In re Miller, supra* at 344-345; see also MCL 712A.19b(1). "[T]he petitioner must provide legally admissible evidence in order to terminate the rights of the parent who was not subject to an adjudication . . . ." *In re CR, supra* at 205-206.

Davis's parental rights to LE were terminated under MCL 712A.19b(3)(g): "The parent, without regard to intent, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age." He argues that his conduct before establishing legal paternity should not be considered because he did not yet owe the child a legal duty. We disagree.

" 'Well-established principles guide this Court's statutory [or court rule] construction efforts. We begin our analysis by consulting the specific . . . language at issue.' " *Kloian v Domino's Pizza, LLC,* 273 Mich App 449, 458; 733 NW2d 766 (2006), quoting *Bloomfield Charter Twp v Oakland Co Clerk,* 253 Mich App 1, 10; 654 NW2d 610 (2002). "This Court gives effect to the Legislature's intent as expressed in the statute's terms, giving the words of the statute their plain and ordinary meaning." *McManamon v Redford Charter Twp,* 273 Mich App 131, 135; 730 NW2d 757 (2006), citing *Willett v Waterford Charter Twp,* 271 Mich App 38, 48; 718 NW2d 386 (2006). "When the language poses no ambiguity, this Court need not look beyond the statute or construe the statute, but need only enforce the statute as written." *McManamon, supra* at 136. "This Court

does not interpret a statute in a way that renders any statutory language surplusage . . . ." *Id.*, citing *Pohutski v City of Allen Park,* 465 Mich 675, 684; 641 NW2d 219 (2002).

While we have not addressed this issue in a published opinion, we have held that a father's conduct before perfecting paternity *can* provide a basis for termination. See *In re Maddox*, unpublished opinion per curiam of the Court of Appeals, issued November 22, 2005 (Docket No. 262009). In *In re Maddox*, we stated at 3-4:

> Respondent McInnes makes a related argument that his parental rights should not have been terminated based on a failure to provide proper care because, as a putative father, he had no legal standing or right to care for the child. Respondent McInnes indeed lacked standing until his paternity was established, as we have noted. *In re KH, supra* at 635-636. However, as a practical matter, respondent McInnes, *even while a putative father, could have offered support or a plan for the care of the child; but he did not attempt to do so*. If respondent's position were adopted, it would contravene the fundamental purpose of child protective proceedings by excluding from consideration a parent's conduct, no matter how neglectful or egregious, until paternity was established. In other circumstances, specifically in the application of the anticipatory neglect doctrine, the court considers conduct that may have occurred even before the birth of the child in question. See *In re AH,* 245 Mich App 77, 84; 627 NW2d 33 (2001). Moreover, as we have also noted, because the court's jurisdiction is tied to the child, it is possible to terminate the parental rights of a parent who has not participated in the proceedings. *In re CR, supra* at 205. [Emphasis added.]

We agree with *In re Maddox* and adhere to its reasoning. Even though Davis, as a mere putative father, did not yet have a legal duty to care for LE, he did have, as her biological father, a clear moral duty to do so, and he could and should have offered support or at least a plan

to care for her. See *In re Maddox, supra.* Davis should have more promptly taken steps to formally acknowledge paternity, and we hold that his failure to do so may be "used against him" as evidence of his failure to provide care and custody.

Other provisions of the Michigan statute indicate that actions of a father occurring before he perfects paternity may be considered for purposes of terminating his parental rights. The existence of statutory grounds involving siblings—such as § 19b(3)(b) (physical injuries or abuse, or sexual abuse of other children), §§ 19b(3)(i), (*l*), and (m) (prior termination of parental rights to other children), § 19b(3)(k) (child abuse of other children)—and certain prior convictions of a parent listed in § 19b(3)(n), indicate that termination of parental rights may be based on conduct occurring before a child is even conceived. Thus, Davis's argument has no merit.

Concerning § 19b(3)(g), there was clear and convincing evidence that Davis failed to provide proper care and custody for LE, because he did not attempt to formally establish legal paternity for the first year and a half of LE's life, did not have housing when she was born, did not plan for her birth, and had a longstanding substance-abuse problem. He never supported LE, and took no steps to determine what he needed to do to perfect paternity, visit, receive services, or be allowed to care for her. There was no bond between him and LE. Davis had an extensive criminal history that included violent crimes. During the pendency of this case, he was jailed for a year and in an inpatient drug-treatment program for three months. He had not yet resumed receiving disability benefits. He was totally dependent on his mother for food, housing, and all other necessities. While he testified that he cared for his other

children while their mother was at work, there was no evidence that he could care for a baby. In sum, the trial court did not clearly err in finding that there was clear and convincing evidence that Davis failed to provide proper care for LE, and that there was no reasonable expectation that he would be able to provide proper care within a reasonable time, considering LE's age.

4

Davis finally argues that it was not in LE's best interest to terminate his parental rights. Again, we disagree.

Once a statutory ground for termination is established, "the court shall order termination of parental rights . . . unless the court finds that termination . . . is clearly not in the child's best interests." MCL 712A.19b(5). That determination is to be made on the basis of the evidence on the whole record and is reviewed for clear error. *In re Trejo*, 462 Mich 341, 353-354, 356; 612 NW2d 407 (2000).

Although he appeared in court in March 2005, Davis failed to establish legal parentage until August 2006. He made no inquiries concerning paternity, placement, or visitation. LE has no bond with him or with any paternal relative. Davis has a lengthy criminal and substance-abuse history. At the time of the best-interest hearing, in February 2007, he was still in the process of having disability benefits reinstated. Therefore, he is completely dependent on his mother for housing, food, and other necessities. He failed to appear for his psychological evaluation, even though the court stressed its importance, and he had missed some appointments with his parole officer. He has two older children who were apparently doing well, but they were raised by their mother. In sum, there was no evidence tending to

show that termination of Davis's parental rights would be detrimental to LE. The trial court did not clearly err in failing to find that termination of Davis's parental rights would be clearly contrary to LE's best interest.

B. THE MOTHER'S CLAIMS ON APPEAL

The mother argues that: (1) the statutory basis for termination was not shown by clear and convincing evidence; and (2) termination of her parental rights was not in the children's best interests.

1

The existence of a statutory ground for termination of parental rights must be proven by clear and convincing evidence. MCR 3.977(F)(1)(b) and (G)(3); *In re Miller, supra* at 344-345; see also MCL 712A.19b(1). "[T]he petitioner must provide legally admissible evidence in order to terminate the rights of the parent who was not subject to an adjudication . . . ." *In re CR, supra* at 205-206.

The mother's parental rights to all six children were terminated under MCL 712A.19b(3)(c)(*i*) and (g):

> (c) The parent was a respondent in a proceeding brought under this chapter, 182 or more days have elapsed since the issuance of an initial disposition order, and the court, by clear and convincing evidence, finds either of the following:
>
> (*i*) The conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.
>
> * * *
>
> (g) The parent, without regard to intent, fails to provide proper care or custody for the child and there is no

reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age.

The mother argues that the trial court erred in finding that there was no reasonable probability that she would be able to rectify the conditions that led to the adjudication, and provide proper care to the children within a reasonable time, considering their ages. The mother asserts that there was no evidence concerning how long of a period a reasonable time would be for the different children of various ages and the court's ruling therefore must be set aside. We disagree.

Concerning § 19b(3)(c)(*i*), the conditions that brought the children into foster care were the mother's lack of appropriate housing, her lack of employment, and her longstanding substance-abuse problem. There was some evidence that the mother had some degree of employment, first with a home health care agency, and then with Costco since approximately March 2006. However, she admittedly never obtained adequate housing. Additionally, despite the court's repeated warnings, she missed over half of her random drug screens, and according to her psychological evaluation, she was at risk of relapsing under the stress of caring for so many children.[8] Therefore, the trial court did not clearly err in finding that the conditions that led to the initial adjudication continued to exist.

Similarly, concerning § 19b(3)(g), failure to provide proper care, the evidence showed that while the mother maintained some employment, she continued to be unable to provide suitable housing for her children. Further, she missed approximately half of her random drug screens, even when doing so resulted in her visits

---

[8] Also, although she claimed it was a mistake, the mother tested positive for cocaine in October 2006.

being suspended, which upset the children. Thus, the trial court did not clearly err in finding that the mother failed to provide proper care.

The mother argues that the trial court erred by not individually considering the ages of her six children in evaluating the second part of these statutory grounds, i.e., whether there was a reasonable likelihood that the conditions would be rectified within a reasonable time, or whether there was a reasonable expectation that she would be able to provide proper care and custody within a reasonable time, *considering the ages of the children.* We disagree.

As argued by the mother, §§ 19b(3)(c)(*i*) and (g) both require that the court consider the ages of the children. By the time the amended petition was filed, however, the children had been in foster care for nearly 19 months. The mother had made no progress in the area of housing and had no plan for obtaining appropriate housing in the foreseeable future. Similarly, she had continued to miss drug screens, despite numerous warnings, even when her noncompliance cost her the right to visit her children and hurt the children's feelings. Thus, even if a reasonable time were a longer time (as it might be for the older children), the trial court did not clearly err in finding that there was no reasonable likelihood that the mother would be able to resolve these problems within a reasonable time.

2

Finally, the mother argues that termination of her parental rights was not in the children's best interests. Again, we disagree.

Once a statutory ground for termination is established, "the court shall order termination of parental rights . . . unless the court finds that termination . . . is

clearly not in the child's best interests." MCL 712A.19b(5). That determination is to be made considering the evidence on the whole record and is reviewed for clear error. *In re Trejo, supra* at 353-354.

All the children were in counseling, except for LE. TS, KL, and BG were being treated for ADHD.[9] KL also had nightmares. All the children, except LE, had behavior problems, to varying degrees. The caseworker noted that the only child who did not have special needs was LE, who was removed from the mother's care at birth.

The mother was employed (though apparently not full-time), she benefited somewhat from parenting classes, was in treatment for her depression, and was apparently receiving counseling, albeit not constantly. The caseworker also recognized that it was difficult to interact with so many children at once. However, the mother missed more than half of her drug screens and tested positive for cocaine in March 2005, May 2005, and October 2006, and for adulterants in June 2006. She never obtained suitable housing, and did not have transportation or a driver's license.

LE was only somewhat bonded with the mother. The other children were very bonded with her. However, the mother's visits were suspended between October 2005 and January 2006, because of her failure to submit to drug screens, and again in July 2006, permanently. Thus, by the time of the termination hearing in February 2007, the children had not seen the mother for more than six months. The caseworker testified that, while the children would experience grief and loss if the mother's parental rights were terminated, they would be able to overcome that loss, with appropriate support, and would then be able to achieve stability and perma-

---

[9] ADHD stands for attention deficit hyperactivity disorder.

nence. In sum, while termination of the mother's parental rights will undoubtedly be difficult for the children, the trial court did not clearly err in failing to find that termination of the mother's parental rights would be clearly contrary to the best interests of the children.

### III. CONCLUSIONS

Concerning Davis: (1) the trial court did not err as a matter of law in exercising jurisdiction over LE; (2) the DHS did not breach any statutory duties to assist him and to provide him with services; (3) the trial court did not err by finding clear and convincing evidence of statutory grounds for termination, and the actions of a dilatory father occurring before he gets around to perfecting paternity may be used against him in termination proceedings; and (4) the trial court did not err in finding that termination was in LE's best interest. Concerning the mother: (1) the trial court did not clearly err by finding clear and convincing evidence of statutory grounds for termination; and (2) the trial court did not clearly err in finding that termination was in the children's best interests.

Affirmed.