# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* I. S. JONDALL, Minor.

UNPUBLISHED
May 5, 2016

No. 328934
Wayne Circuit Court
Family Division
LC No. 13-514874-NA

Before: JANSEN, P.J., and SERVITTO and M. J. KELLY, JJ.

PER CURIAM.

Respondent-father appeals by right the trial court's order terminating his parental rights to the minor child. We conclude that the trial court did not clearly err when it found that the Department of Health and Human Services proved by clear and convincing evidence grounds to terminate respondent's parental rights and that termination was in the child's best interests. Accordingly, we affirm.

## I. BASIC FACTS

The minor child's mother gave birth to him in May 2012. In October 2013, the Department petitioned to remove the child from her care after she was involved in a hit-and-run automobile accident with the child in her care. She was arrested after officers found cocaine and a crack pipe in her car; she admitted that cocaine was her drug of choice. The Department noted in the petition that respondent was the child's putative father and that he was in prison.

Respondent participated in the proceedings involving the mother. After genetic testing revealed that he was the child's biological father, respondent agreed to execute an affidavit of parentage. He signed the affidavit in June 2014, but the child's mother did not sign it until September 2014.

In September 2014, a referee held a review hearing. At that hearing, there was evidence that the child's mother had relapsed in June 2014 and no longer wanted to participate in services. The caseworker stated that she had not yet provided respondent with any services, but would investigate what was available to him in prison. The referee also warned that there was a potential issue as to the court's authority to adjudicate respondent's parental rights under *In re Sanders*, 495 Mich 394; 852 NW2d 524 (2014).

-1-

At a review hearing held in December 2014, respondent testified that he wanted to plan for the child. He also stated that he was on the waiting list for a program—called Chance for Life—at his new prison facility and was participating in NA/AA classes. He acknowledged that his mother—the child's grandmother—did not wish to plan for the child, but stated that she was trying to find another relative who might take him. Later that same month, the trial court entered an order finding that respondent's plan for placing the child with his mother was not viable.

In February 2015, the Department filed a supplemental petition to terminate the parental rights of the child's mother and respondent. The trial court held a pretrial conference in March 2015. At that conference, the court learned about respondent's efforts to have the child placed with fictive kin. He wanted the child placed with a man that he referred to as his step-brother and his wife, but the couple had no legal familial relationship to respondent or the child. The trial court stated that such placements were "problematic," but nevertheless indicated that the Department should "at least talk to these people and determine whether or not they would be appropriate and to investigate them."

The trial court held another hearing later that same month and determined that it was necessary to dismiss the petition against respondent because he had not yet been adjudicated an unfit parent. The trial court entered an order to that effect after the hearing.

In April 2015, the Department petitioned the court to take jurisdiction to consider respondent's fitness as a parent and the trial court held another review hearing. At the hearing, the foster care worker assigned to the case, Rasha Bradford, testified that she sent a parent-agency plan to respondent in January. She stated that respondent apparently was participating in AA/NA in prison and was on the waiting list for a program called "A Chance for Life," but she was unable to verify his claims. Bradford had spoken with respondent's fictive kin to consider them for placement, but agreed that the child had no familiarity with them. She stated that the child did not even meet his paternal grandmother until after respondent signed the affidavit of parentage. The trial court later authorized the petition against respondent.

The trial court held a trial and dispositional hearing in June and July 2015. At the trial, the child's mother testified that respondent did not live with her when she had the child. When asked if he helped with the child after his birth, she stated that he did buy "some diapers, or wipes and seen him a handful of times." He also watched the child twice for a few hours in the months before he went to prison. He did not provide financial support and did not have a job or transportation. Respondent also did not then question the child's paternity at that time; he did not question it until the beginning of the court proceedings, which surprised her. After the start of the court proceedings, respondent would contact her through his mother. He did not, however, arrange for any support or clothing.

Respondent testified about his lengthy criminal record and stated that his maximum release date was in 2028. He acknowledged that the parole board gave him a "continuance one year ago" because he had misconducts in prison, but stated that he would see the board again in July. Respondent said that he last saw the child a month before he went to prison. He conceded that he had not provided financial support for the child during the close to thirty months that he has been in prison. Nevertheless, he tried to arrange proper care and custody for the child by having him placed with his mother, or with his fictive kin, or with his oldest son's mother.

Respondent was not sure that he was the child's father at first because he and the child's mother "had gone back and forth from the few months prior to [the child's] birth . . . fighting verbally" and she suggested that he might not be the father. He was, however, hopeful that he was the father. On cross-examination, he admitted that he and the child's mother talked together about the child while she was pregnant and that he had no reason to think he was not the child's father. He also stated that he went to Florida to establish a home for them.

Bradford testified that respondent's mother refused placement right after the proceedings began. Thereafter, respondent's mother suggested the mother of respondent's older son and respondent's fictive kin for possible placement. Neither had a legal relationship with the child; for that reason, she stated, they had to be treated like any non-relative placement. Additionally, neither the older child's mother nor the fictive kin had an on-going relationship with the child— they were strangers to him. And, by the time she received information about these possible placements, the child had already been placed with his foster family for one year.

After the close of evidence on the first day, the trial court issued its opinion on the issue of jurisdiction. The court first rejected the argument that respondent was excused from taking any responsibility for the care of the child because he was merely a putative father: "That's not how it works. You don't get to use the fact that you're a putative father to your advantage." It then examined whether respondent provided proper care or custody for the child. It noted that the evidence showed that he only suggested his mother as a possible placement and she refused to take the child. Thereafter, there were other persons, but those persons were not suggested until months later. Because respondent did not provide proper care or custody for the child and did not arrange for a third-party to provide proper care and custody, the court found that the Department had established by a preponderance of the evidence grounds for taking jurisdiction with respect to respondent's parental rights under MCL 712A.2(b)(1).

Bradford also testified during the dispositional phase. She said that the child has been with his foster family since December 2013 and had bonded to them. He is doing well and refers to them as "mom and dad." Bradford said the child has not mentioned his biological father, and has not received any calls, letters, or gifts from him. On cross-examination, she agreed that respondent had sent handmade cards to the child, which respondent's mother delivered.

Bradford stated that she contacted respondent through the mail and he signed a parent-agency agreement in January 2015. The Department asked him to "make sure that his emotional stability was in place, which included a psychological evaluation . . . ." He was also instructed to communicate regularly with the caseworker, "take care of all his [] existing criminal matters" and take parenting classes. She contacted the prison to find out what services were available to him and discovered that it had NA/AA and a type of parenting class. He was on the waiting list for the class. Bradford stated that she could not give respondent specific referrals until he was released.

Bradford opined that it was in the child's best interests to remain with his foster parents because it was the "most family-like setting" and he would be able to "grow and reach his full potential" with them. Because the child has been with his foster parents longer than with anyone else, it is fair to say that they have raised him.

-3-

The current caseworker, Morgan Barr, testified that there were no communications from respondent in the file since January 2015. He also had not provided any financial support. The child continues to thrive under his foster parents' care and has an evident bond with them.

Respondent again asserted at the dispositional phase that he did not seek custody of the child because he did not know if the child was his son. There was also never an order compelling him to support the child and, in any event, he was unable to support the child because he was on disability. He also sent homemade cards and letters, which his mother delivered.

Respondent stated that he would be meeting with the parole board in July and was confident that he would be paroled because he "completed every program, everything they've [the board] wanted, they've asked of me, I've done." He has also had a "continuous positive work record," has taken vocational classes, and stayed out of trouble. If he gets paroled, respondent said, his mother would get him his "own place." He also plans to get a job and knows he will be able to do so because he has "never had trouble finding a job, even with felonies." He intends to rely on his mother financially and for the child's care, much like he does for his older son: "She's constantly there in my oldest son's life, you know, between dropping him off at school, some days a week, picking him up. She has him two to three days a week." He stated that he has a "great relationship" with his older son, who is nine, and that he has had a great relationship for his whole life—that is, "aside from my mistakes and my incarcerations . . . aside from that, you know, we have a fantastic bond." On cross-examination, respondent conceded that he has been in prison for much of his older son's life. The same thing won't happen to this son, he explained, because he is older and will not make the same mistakes.

Respondent stated that he wanted to arrange for his fictive kin to have guardianship over the child while he gets things together and proves himself. Although the child has been with his foster parents for close to two years, respondent thinks it best for the child to "end up with his blood family."

Respondent's mother testified that respondent is an "excellent father" to his older son. He is "very close" with him and they have a "very special bond." He has "always taken care of him." After respondent gets out of prison, she is going to do anything he needs to help him survive.

After the close of proofs, the trial court concluded that the Department had established grounds to terminate the parental rights of the child's mother. Turning to respondent, the court rejected respondent's contention that he could do nothing before he obtained the results of the paternity test and signed the affidavit of parentage. There were obstacles in respondent's path, the court agreed, but those obstacles were of his own making. The court found that there was no real dispute as to paternity and, had he chosen to do so, respondent could have acknowledged the child on the day of his birth.

The trial court also determined that respondent had not established a viable plan for the child's care. Whether he might be paroled was merely speculation and the child needed something definite. Moreover, respondent's mother refused to take the child and respondent did not offer other suitable caregivers until after the child had bonded with his foster parents. The court found that respondent "has never provided full time care for this child. He's never

provided proper care and custody." Because there was evidence that he would not be able to provide or arrange for proper care and custody within a reasonable time, it found that the Department had established grounds for terminating respondent's parental rights under MCL 712A.19b(3)(g). The trial court also found that termination was in the child's best interests.

The trial court entered an opinion and order terminating respondent's parental rights to the child in July 2015. Respondent now appeals in this Court.

## II. ANALYSIS

### A. STANDARDS OF REVIEW

On appeal, respondent argues that the trial court erred when it terminated his parental rights to the minor child. More specifically, he argues that the trial court could not properly terminate his parental rights where the record shows that the Department failed to provide him with adequate services while he was in prison, and clearly erred when it found that he had not and would not be able to provide proper care and custody because the evidence showed that he "had a viable plan for reunification in alternate placements" with the mother of his older son, or with his fictive kin.

This Court reviews de novo whether the trial court properly selected, interpreted, and applied the relevant statutory provisions. *In re Gonzales/Martinez Minors*, 310 Mich App 426, 431; 871 NW2d 868 (2015). This Court reviews a trial court's factual findings for clear error. *Id.* at 430. A finding is clearly erroneous when the reviewing court, on the entire record, is left with the definite and firm conviction that a mistake has been made. *Id.* at 430-431.

### B. PRISONERS AND PARENTAL RIGHTS

The trial court found that the Department proved by clear and convincing evidence grounds for terminating respondent's parental rights under MCL 712A.19b(3)(g). The trial court may terminate a parent's parental rights under MCL 712A.19b(3)(g), when the "parent, without regard to intent, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age." The evidence showed that respondent did not provide proper care and custody to the child at any point before the Department became involved with the child and did not try to plan for the child's care and custody until after he signed the affidavit of parentage. Thus, the primary issue for the trial court was whether there was a reasonable expectation that respondent would be able to provide proper care and custody for the child within a reasonable time considering the child's age.

Respondent equates his situation with that of Richard Mason, whose parental rights were at issue in our Supreme Court's decision in *In re Mason*, 486 Mich 142; 782 NW2d 747 (2010). In Mason's case, there was evidence that he had some involvement with his children and that he supported them. *Id.* at 146-147. The Department eventually removed the children and provided their mother with services, but did not provide Mason with any services. *Id.* at 147. The Department also placed the children with Mason's relatives. *Id.* at 148. After Mason was incarcerated, the trial court did not take steps to ensure his participation in hearings for more than 16 months. *Id.* And the trial court ultimately found that the Department had established grounds

-5-

for terminating Mason's parental rights to the children on the ground that Mason had not personally cared for the children for the past two years and could not avail himself of any services while imprisoned. *Id.* at 151.

In examining whether the trial court erred when it terminated Mason's parental rights, our Supreme Court first noted that the Department had a duty to make " '[r]easonable efforts to reunify' " Mason with his children. *Id.* at 152, quoting MCL 712A.19a(2). It concluded that termination was improper because the Department and trial court did not afford Mason a "meaningful and adequate opportunity to participate" in the proceedings. *Id.* The Court then went on to address three areas where the Department and trial court disserved Mason: the trial court failed to ensure his participation in the hearings as was his right under MCR 2.004; the Department failed to provide Mason with services; and, the trial court failed to consider that Mason could provide proper care and custody for his children through placement with relatives. See *id.* at 152-166.

In this case, respondent does not argue that he did not have the opportunity to participate in the proceedings. Indeed, the record shows that he participated in the hearings from prison and, after he finally agreed to sign the affidavit of parentage, the trial court assigned a lawyer to assist him. Respondent instead asserts that, as was the case with Mason, the Department focused its efforts at reunification on the child's mother and neglected to provide him with services. It then determined in part that he would not be able to provide proper care and custody within a reasonable time because he would need services even if he were released from prison in the near future. He similarly maintains that the trial court erred by refusing to consider his efforts to provide proper care and custody through relative placements.

## 1. SERVICES FOR INCARCERATED PARENTS

The Department has a statutory duty to prepare a service plan for a parent, which must include a schedule of services to be provided to the parent. See *In re Mason*, 486 Mich at 156, citing what is now MCL 712A.13a(10)(a), and MCL 712A.18f(3)(d). The Department and trial court must also periodically review and update the plan in order to help the parent rectify the conditions that caused the child to be placed or remain in foster care. *Id.* at 156-158. Where the Department has not provided the family with the services necessary to meet the reasonable efforts requirement, the trial court is not required to order the agency to initiate proceedings to terminate the parent's parental rights. *Id.* at 158-159, quoting MCL 712A.19a(6).

In Mason's case, our Supreme Court determined that the trial court clearly erred when it terminated Mason's parental rights on the basis of deficiencies caused by the Department's failure to provide Mason with any services:

> Although the initial conditions of MCL 712A.19a(6) were met—the children could not yet be returned to respondent and they had been placed out of their home for more than 15 months—the court and the [Department] failed to consider that [Mason] had *never* been evaluated as a future placement or provided with services. Rather, the [Department] had focused on its attempts to reunify the children with [their mother] and, in doing so, disregarded [Mason's] statutory right to be provided services and, as a result, extended the time it would take him

to comply with the service plan upon his release from prison—which was potentially imminent at the time of the termination hearing. The state failed to involve or evaluate [him], but then terminated his rights, in part because of his failure to comply with the service plan, while giving him no opportunity to comply in the future. This constituted clear error. . . .[*Id.* at 159.]

In this case, the Department did not prepare a case plan for respondent or provide him with any services during the earliest months of its intervention; however it did not do so because respondent chose not to acknowledge the child as his own. The Department has no obligation to plan for, or provide services to, a putative father. See *In re LE*, 278 Mich App 1, 18-19; 747 NW2d 883 (2008). Moreover, a putative father's failure to take steps to plan or provide for his child before perfecting paternity may be used as evidence of his failure to provide proper care and custody. *Id.* at 24. As the trial court found at the dispositional hearing, whatever barriers there were to respondent's earlier participation were barriers of his own making. Had he chosen to do so, respondent could have acknowledged the child on the day of his birth, or at any point in the proceedings before he obtained the results of the genetic testing. Accordingly, he cannot now hide behind the lack of definitive proof of paternity to insulate himself from his moral responsibility to offer care and support for the child. See *id.* at 23-24 (stating that, although a putative father does not have "a legal duty to care for" a child, as a biological father, he has a "clear moral duty to do so, and could and should have offered support or at least a plan to care" for the child).

In addition, although the Department did not provide respondent with specific services, it does not necessarily follow that its efforts were unreasonable under the circumstances. See *In re Frey*, 297 Mich App 242, 248; 824 NW2d 569 (2012) (stating that the Department has a duty to expend *reasonable* efforts to provide services to secure reunification). The Legislature has stated that the Department need only make reasonable efforts to prevent removal, to rectify the conditions that led to removal, and to reunify the child with his or her family. See MCL 712A.18f(4); MCL 712A.19(12) and (13); MCL 712A.19a(2). As the Legislature has recognized, what constitutes reasonable efforts will depend on the specific circumstances of each case. See MCL 712A.14b(1)(c) (stating that the trial court may authorize the Department to take a child into immediate protective custody if, in relevant part, it finds that "[c]onsistent with the circumstances," the Department made "reasonable efforts . . . to prevent or eliminate the need" for the child's removal). The Department's ability to provide services to an incarcerated parent is far more limited than its ability to provide services to a parent who is not incarcerated. The Department has no control over an imprisoned parent's conditions of incarceration, his or her access to services, his or her placement in a particular facility, or a host of other factors that implicate the Department's ability to intervene. As such, the reasonableness of the Department's efforts must be evaluated in light of the circumstances involving the incarcerated parent.

Although the Department did not provide respondent with specific services before he acknowledged the child as his own, it did attempt to find a proper placement for the child with his relatives. It considered placing the child with respondent's mother, but she refused the placement. The Department also invited respondent to provide the names of other alternative care providers for the child. After he perfected paternity, the Department created a parent-agency agreement for respondent and gave him specific recommendations to facilitate reunification. The Department asked him to complete a psychological evaluation and, if

recommended, a psychiatric evaluation. It also asked him to attend individual therapy, parenting classes, and resolve his criminal matters. There was also evidence that caseworkers tried to investigate the services available to him in prison.

The Department had no authority or control over respondent's placement or the services that were available to him in prison. And the Department's efforts must be judged accordingly. Under the totality of the circumstances, it was reasonable for the Department to require respondent to inquire about the services that were available to him in prison and avail himself of those services. It was also reasonable for the Department to require him to take whatever steps were necessary to resolve his criminal matter and obtain his release. If respondent felt that these efforts were inadequate, he had an obligation to assert the need for further accommodations when the court adopted the plan. See *In re Frey*, 297 Mich App at 247. In addition, respondent has not identified any services that the Department could have provided him during his incarceration that would have better enabled him to provide proper care and custody for his child after his release from prison.

On this record, we reject respondent's contention that the Department failed to provide him with adequate services. The Department's efforts were reasonable under the totality of the circumstances.

## 2. CARE AND CUSTODY THROUGH PLACEMENT

Respondent also argues that the trial court clearly erred when it found that he would not be able to provide proper care or custody. He argues that the evidence showed that he had a viable plan to provide proper care and custody through placement of the child with relatives pending his release from prison. He further claims that he demonstrated that he would likely be released from prison and had a good plan to provide for the child once released.

Our Supreme Court has held that being incarcerated is not by itself a ground for terminating a parent's parental rights. *In re Mason*, 486 Mich App at 160 ("The mere present inability to personally care for one's children as a result of incarceration does not constitute grounds for termination."). Rather, it recognized that a parent can provide proper care and custody for his or her children by placing them with relatives or guardians. *Id.* at 161. Because a parent can provide proper care and custody through placements, the fact that the parent is currently imprisoned is "not decisive." *Id.*

In Mason's case, our Supreme Court determined that the trial court erred because it "never considered whether [Mason] could fulfill his duty to provide proper care and custody in the future by voluntarily granting legal custody to his relatives during his remaining term of incarceration." *Id.* at 163. It also opined that it was unnecessary for Mason to make such arrangements because his children had already been placed with relatives. *Id.* at 163-164. The Court concluded that the trial court's decision to proceed with factual findings despite the "holes in the record" effectively relieved the Department of its burden to prove grounds for termination by clear and convincing evidence. *Id.* at 166.

Accordingly, a trial court cannot give decisive weight to the fact that the parent is in prison when making its finding as to whether the parent would be able to provide proper care and custody to the child within a reasonable time considering the child's age under MCL 712A.19b(3)(g). *In re Mason*, 486 Mich at 161, 164-165. The court also has an obligation to consider—on a properly developed record—the evidence that the parent might be able to arrange proper care and custody for the child during the remaining period of his incarceration by placing the child with a relative or other guardian. *Id.* at 163-166. Notably our Supreme Court did not preclude the trial court from considering the history and nature of the parent's incarceration or, where the record has been properly developed, the near-term viability of a proposed alternative placement when making its finding as to whether the parent would be able to provide proper care and custody for the child within a reasonable time considering the child's age.

Aside from the fact that he was in prison throughout the lower court proceedings, the circumstances of respondent's case are not like those involved in *In re Mason*. The Department and trial court immediately involved respondent in the proceedings and the Department inquired of him about possible relative placements. Despite the fact that he did not initially acknowledge the child as his own, the Department tried to place the child with respondent's mother. She, however, she was unable to accept that responsibility. Because there were no other relatives—maternal or paternal—who were willing and able to care for the child, the Department had to place the child with a foster family. Thus, unlike the case in *In re Mason*, the record on this issue was developed and it demonstrated that the Department took steps to help respondent arrange for proper care and custody through a relative.

Even though the child had been placed in foster care, the record similarly shows that the Department remained open to relative placement. Nevertheless, there is evidence that months passed before respondent suggested possible alternative placements for the child. The suggested placements also did not involve relatives; rather, respondent suggested placement with the mother of his older son and suggested placement with fictive kin. Because the child had been in foster care for months and the suggested placements were not with relatives, the Department determined that these placements were not immediately viable alternatives for the child. The trial court could properly rely on this evidence to find that respondent did not have a viable plan to provide proper care and custody for the child through an alternative placement while he remained in custody.

Finally, although there was evidence that respondent could be released from prison within months of the dispositional hearing, and that he had a plan for the care and custody of the child upon his release, there was also evidence that he had missed a prior opportunity at parole because of his misbehavior while in prison. Hence, contrary to his claim on appeal, it was not at all clear that his release was "imminent." Considering respondent's lengthy criminal record and the evidence that he had already been passed over for parole, the trial court could reasonably find that respondent would not be able to directly care for the child within a reasonable time considering the child's age. Consequently, there was evidence to support the trial court's finding that respondent not only had not provided proper care and custody of the child, but also that he would be unable to provide proper care and custody for the child within a reasonable time considering the child's age.

The trial court did not clearly err when it found that the Department had established by clear and convincing evidence grounds for terminating respondent's parental rights under MCL 712A.19b(3)(g).

Respondent has not challenged the trial court's findings on the child's best interests. See MCL 712A.19b(5). Nevertheless, we note that there was record support for the trial court's finding that termination was in the child's best interests. There was testimony that the child did not have a bond with his father and that he was thriving under the care of his foster family. The foster family further wanted to adopt the child and his biological mother stated that she wanted the child to remain with his foster family. See *In re Gonzales/Martinez Minors*, 310 Mich App at 434-435 (listing the factors that may be considered in determining a child's best interests). Under the circumstances, the trial court did not clearly err when it found that it was in the child's best interests to terminate respondent's parental rights.

### III. CONCLUSION

The trial court did not clearly err when it found that the Department had established a ground for terminating respondent's parental rights to the minor child and that termination was in the child's best interests.

Affirmed.

/s/ Kathleen Jansen
/s/ Deborah A. Servitto
/s/ Michael J. Kelly