# STATE OF MICHIGAN

# COURT OF APPEALS

In re MONTGOMERY, Minors.

UNPUBLISHED
June 16, 2016

No. 330649
Calhoun Circuit Court
Family Division
LC No. 12-000500-NA

Before: MARKEY, P.J., and OWENS and BOONSTRA, JJ.

PER CURIAM.

Respondent appeals by right the trial court's order terminating his parental rights to the minor children under MCL 712A.19b(3)(g) (failure to provide proper care and custody) and (3)(j) (reasonable likelihood of harm). We affirm.

Respondent is the father of three minor children: JAM, ELM, and JJM.[1] On July 30, 2015, Battle Creek police officers Jonathon Kilbourn and Christopher Rabbitt received a call about young children wandering around unsupervised. Kilbourn testified that he arrived at the home of an unidentified neighbor of respondent's and that JJM and ELM, who were approximately two to three years old, were eating cookies and being comforted by the neighbor who had taken them in. Kilbourn and Rabbit went to respondent's home and found the front door ajar. JAM was inside by himself playing with a toy. Kilbourn testified that JAM told him that respondent was sleeping in a bedroom. Kilbourn further testified that he announced his presence and that there was no response. After Kilbourn knocked on the door to the bedroom, a resident of the house,[2] Ginette Konrad, opened the door. Kilbourn saw respondent lying on the bed and opined that it looked like respondent had just woken up. Kilbourn testified that he asked respondent about the children and that respondent indicated that he had taken the children's

---

[1] The children's mother was initially a party to proceedings below, but voluntarily released her parental rights at the beginning of the combined adjudication and dispositional hearing on November 17, 2015. She is not a party to this appeal.

[2] Respondent, the children's mother, and Konrad all lived in the house along with the three children. Konrad testified that the children slept in the living room, while the adults shared a downstairs bedroom; she testified that the upstairs area was not livable, although the reason for this was not made clear in the record.

-1-

mother to work at approximately 7:00 a.m. when the children were still sleeping. Rabbitt testified that respondent indicated that the children were "last known to be asleep on the couch." According to Kilbourn, respondent further indicated that he went back to sleep when he returned home until the time that Kilbourn made contact with him, which was around noon. Kilbourn testified that respondent appeared emotionless and did not seem to feel that the matter was urgent; Rabbitt also testified that respondent did not ask where the children were or about their well-being.

Kilbourn testified that the home contained garbage both on the porch and in the home. Rabbit testified that "[t]he interior of the house appeared to be in disrepair," and that there were several electrical outlets that were exposed and in reach of the children. Rabbitt further testified that things were "strewn throughout the floor" of the house and that there was a pungent odor, which he attributed to old garbage. According to Rabbitt, the home appeared uninhabitable, so he contacted a city Code Compliance Officer, identified in the record only as Francisco. Rabbitt testified that Francisco received consent from respondent to search the home. Rabbitt further testified that he accompanied Francisco through the house, which was "common for safety issues." During the search, Rabbit found a glass pipe in the bedroom of the type commonly used to smoke crack cocaine. Rabbitt further testified that there was charring on the interior of the pipe but that there was not "anything that was able to be tested for a true determination of what . . . narcotics it was used for." After viewing the home, Francisco found that the house was not livable and it was condemned. According to the children's mother, a notice of condemnation was placed on the house on August 3, 2015. The children were taken in by the children's maternal grandparents. Respondent was arrested for outstanding bench warrants, one of which was for assaulting the children's mother with a baseball bat. This assault occurred in the home while the children were present.

That same day, Kelby Coffelt, who worked for Children's Protective Services (CPS), filed a complaint, alleging that CPS had received a call regarding JJM and ELM on July 30, 2015, and that they were found wandering a block away from their home. The complaint also alleged that all adults in the home used drugs and that the home had been condemned as unfit for habitation. The complaint further alleged that JAM and ELM had been removed from their parents' home in 2012 for issues involving drug use by respondent and their mother and the home being an unsafe residence for children. The children were removed from the home in that 2012 case and placed in the care of petitioner. Respondent and the children's mother were offered services in 2012 and 2013 and the children were returned to their care after 9 months.

Following the filing of the complaint in the instant case, the children were placed under the care and supervision of petitioner. On August 11, 2015, petitioner filed a petition for termination. The petition contained substantially similar allegations to the complaint and requested termination of both parents' parental rights. The petition alleged that termination was proper under MCL 712A.19b(3)(g) (failure to provide proper care and custody) and (3)(j) (reasonable likelihood of harm), and it was subsequently authorized. The children remained with their maternal grandparents.

Respondent remained in jail until September 2, 2015. Following his release, respondent underwent a psychological evaluation from Dr. Randall Haugen.

The trial court held a combined adjudication and dispositional hearing on November 17, 2015. The children's mother testified to two incidences of domestic violence between her and respondent in 2015, and stated that the police were called to their home because they were fighting and arguing. She testified that she had obtained a personal protection order (PPO) in 2015 against respondent, but had "dropped" the PPO primarily to avoid impacting respondent's ability to see his children. The children's mother further testified that she, respondent, and Konrad used crack cocaine in the home while children were present, and that they used crack cocaine on July 29, 2015 and into the early morning hours of July 30, 2015. She testified that respondent had been up all night using crack cocaine when he took her to work around 7:00 a.m. on the morning of July 30. She testified that the house was a "mess, dirty dishes, clothes everywhere, just unorganized, not clean," and further that there was an open electrical box in the bedroom, food containers and garbage laying around in the kitchen, furniture blocking the stairs, and dirty clothes on the floor in various rooms of the house.

Haugen testified that respondent indicated he had a "pretty conflictual" relationship with the children's mother, and admitted that the children witnessed one episode of domestic violence involving a baseball bat, although he claimed that it was he who had been hit with the bat. Haugen testified that respondent admitted to relapsing into using crack cocaine earlier that year after a period of sobriety, and that he was using crack cocaine two or three times a week starting in March of 2015. Haugen testified that respondent had problems with impulse control and regulating his behavior. Haugen testified that the children had been harmed by respondent's conduct by experiencing "early disrupted parent child attachments" and having a chaotic life in an unsafe living situation.

With regard to the services provided after the children were removed in 2012, Haugen testified that respondent relapsed into using drugs relatively shortly after the children were returned to his care. He testified that respondent was "[v]ery prone to relapse" and had received a poor prognosis in 2012. Haugen further testified that respondent required fairly intensive therapies and opined that, if the Court were to try reunification, respondent would need to "demonstrate really consistent behavior and change well over a year." However, with respect to respondent's prospects for success, Haugen opined, "I think he'll be successful in the short term, but predictably once the external pressures decrease over time, just the same as before, predictably, his prognosis is poor." Haugen further explained that there was not much change from respondent's prior evaluation in 2012, and that respondent would likely fall back into the same pattern, as he regressed easily under stress.

Kilbourn and Rabbitt testified as described above. The trial court took jurisdiction over the children. During the dispositional hearing, foster care worker Jessica Wine testified that the children remained placed with their maternal grandparents, that the placement was a pre-adoptive placement, and that the grandparents were going through the necessary steps to become licensed. Wine further testified that the home was physically appropriate for the children. Wine testified that the children's behavior had improved since they had been removed, and that they were receiving counselling for acting out sexually and acting aggressively. Wine testified that respondent had secured employment after being released from jail, and that respondent attended his supervised parenting time with the children, although Wine testified that she did not witness a lot of emotional involvement and felt that respondent did not apply appropriate and consistent

discipline. Wine testified that the children were aware that respondent had assaulted their mother; for example, they commonly asked their mother if Daddy "got" her last night.

Wine testified that petitioner was seeking termination based on drug use, respondent's psychological history, and his prior history with services. Ultimately, Wine opined that it was in the children's best interests for respondent's parental rights to be terminated and that the children would not be safe with respondent. Wine testified that she "would be very worried that a very similar issue" could happen again and that the children could possibly leave the home again and be hit by a car or "picked up" by someone. Moreover, Wine testified that she thought respondent "could comply with services and show benefit and then . . . once the case closed, the issues would still be there and the children would be at risk again." Wine further testified that each child needed a stable environment and proper supervision and that respondent would relapse after he is no longer being monitored.

Konrad testified on behalf of respondent, and stated that respondent had a good bond with his children and cared for them well. She testified that respondent was attending counseling and abstaining from drugs. She admitted that all three adults had used crack cocaine on the night of July 29, 2015 and morning of July 30.

The trial court found that statutory grounds for termination had been proven by clear and convincing evidence. The trial court noted that that two of the children were found wandering in their neighborhood while the third child was inside the home with the front door wide open. The trial court found that respondent relapsed into using crack cocaine and that the house was entirely unlivable, given that it was condemned. The trial court noted the previous case in which respondent was involved and that two of the children were previously removed for similar reasons. The trial court explained that the children were removed for nine months and that respondent relapsed shortly after the case closed. The trial court concluded that respondent had failed to provide for the proper care and custody of the children, and that he could not provide for the proper care and custody of the children in a reasonable time. The trial court also reasoned that respondent's history of drug use and relapse showed that there was a reasonable likelihood that the children would be harmed if returned to respondent.

With respect to the children's best interests, the trial court noted that the children were placed with their maternal grandparents, that the grandparents could possibly adopt the children, and that there was also a possibility that a relative of respondent could adopt them. The trial court found that, "clearly it's in the best interests of all three of the children, individually, to have a permanent safe placement that is not clouded by drug use of a parent, neglect by a parent, [and] criminality by a parent. . . ." The trial court reasoned that the children were currently doing well and were safe and that they deserved permanency and stability. Thus, the trial court determined that termination of respondent's rights was in the children's best interests.

This appeal followed.

## II. STATUTORY GROUNDS FOR TERMINATION

Respondent first argues that there was insufficient evidence to find a statutory ground for termination of his parental rights. We disagree. "In order to terminate parental rights, the trial

court must find by clear and convincing evidence that at least one of the statutory grounds for termination in MCL 712A.19b(3) has been met." *In re VanDalen*, 293 Mich App 120, 139; 809 NW2d 412 (2011). This Court reviews the trial court's determination for clear error. *Id.*; MCR 3.977(K). "A finding is 'clearly erroneous' if, although there is evidence to support it, we are left with a definite and firm conviction that a mistake has been made." *In re HRC*, 286 Mich App 444, 459; 781 NW2d 105 (2009). Further, this Court gives "deference to the trial court's special opportunity to judge the credibility of the witnesses." *HRC*, 286 Mich App at 459.

With respect to MCL 712A.19b(3)(g), termination is appropriate when "[t]he parent, without regard to intent, fails to provide proper care and custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age."

Here, respondent used crack cocaine throughout the night of July 29, 2015 and into the early morning hours of July 30, 2015. Respondent subsequently dropped the children's mother off at work and went to sleep when he returned to the house. Later that day, JJM and ELM were found wandering outside the home around noon. When the police arrived at respondent's home, the front door was wide open, respondent was asleep, and JAM was found inside the open door playing on the living room floor. The house was unlivable and was thereafter condemned. Given the condition of the home and the fact that the young children—all of whom were under five years of age—were unattended, the trial court did not err in finding that respondent failed to provide for the proper care and custody of the children.

With respect to respondent's future ability to care for the children, given that respondent previously had two of the children removed in 2012 for similar issues, that respondent relapsed after his children were returned to his care, and that Haugen reported that respondent's potential for rehabilitation was poor, there was not a reasonable expectation that respondent would be able to provide proper care and custody within a reasonable time considering the children's young age. We are not left with a definite and firm conviction that a mistake has been made with respect to this statutory ground. See *HRC*, 286 Mich App at 459. The trial court did not clearly err in finding that there was sufficient evidence to establish this statutory ground. *VanDalen*, 293 Mich App at 139.

In reaching our conclusion, we reject respondent's argument that he should be able to delegate the care of his children while he makes improvements in his life. Respondent relies on *In re Mason*, 486 Mich 142, 160, 161 n 11; 782 NW2d 747 (2010) (holding that "[t]he mere present inability to personally care for one's children as a result of incarceration does not constitute grounds for termination" and stating that "Michigan traditionally permits a parent to achieve proper care and custody through placement with a relative"). In *Mason*, 486 Mich at 163, "the [trial] court never considered whether respondent could fulfill his duty to provide proper care and custody in the future by voluntarily granting legal custody to his relatives during his remaining term of incarceration." *Id*. However, the instant case is clearly distinguishable from *Mason*. Wine testified that the children were removed from the home on July 30, 2015, and that they were placed with their maternal grandparents. There is no indication from the record that respondent took any part in facilitating this placement or that he would have voluntarily placed the children with the maternal grandparents. Rather, the children were involuntarily

removed because of the drug use in the home, which led to the children being unsupervised, and because the unlivable conditions of the home, which led to the home being condemned.

Respondent further argues that he has shown that he can comply with and benefit from the service plan, relying on *In re JK*, 468 Mich 202, 214; 661 NW2d 216 (2003) (stating that a "parent's compliance with the parent-agency agreement is evidence of her ability to provide proper care and custody"). However, compliance is not necessarily dispositive of the issue. A parent must demonstrate sufficient compliance with or benefit from services targeted to address the identified problems. *In re Frey*, 297 Mich App 242, 248; 824 NW2d 569 (2012). Here, while respondent may have shown compliance with his service plan in the short term, his compliance is negated by strong evidence of likely relapse and lack of long-term benefit from services. Respondent relapsed after the 2012 case, lacked long-term benefit from the previous services offered in that case, and was evaluated by Haugen as having a poor prognosis.

With respect to MCL 712A.19b(3)(j), termination is proper when "[t]here is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent." The likelihood of harm to the child under (j) may be physical or emotional harm. *In re Hudson*, 294 Mich App 261, 268; 817 NW2d 115 (2011).

Here, JJM and ELM were found wandering outside the home, and JAM was found playing on the living room floor with the front door of the house wide open. All of the children were younger than five years of age. Respondent's failure to properly supervise the children can be directly attributed to the fact that respondent had spent the prior night smoking crack cocaine. Given respondent's history of drug use and relapse and the fact that the children's lack of supervision can be attributed to drug use, there was a reasonable likelihood that the children would be harmed if returned to respondent. Moreover, Haugen reported that respondent lacked insight regarding the extent to which his drug use and conduct affected the children, and that the children have already been harmed and had "experience[d] early disrupted parent child attachments related to the same issue," and went through a very chaotic life.

Additionally, unlike *In re LaFrance*, 306 Mich App 713, 730-731 (2014), the trial court's findings regarding statutory grounds for termination was not based solely on drug use and the doctrine of anticipatory neglect. The trial court considered respondent's drug use in connection with the failure to supervise the children and the condition of their home. Further, as stated above, Haugen testified that the children had in fact been harmed by respondent's conduct. The evidence established a direct connection between respondent's drug use and the health and well-being of the children. Thus, we are not left with a definite and firm conviction that a mistake has been made with respect to this statutory ground. See *HRC*, 286 Mich App at 459. Therefore, the trial court did not clearly err in finding that there was sufficient evidence to establish this statutory ground. *VanDalen*, 293 Mich App at 139.

### III. BEST-INTEREST DETERMINATION

Respondent also argues that termination was not in the children's best interests. We disagree. "Once a statutory ground for termination has been proven, the trial court must find that termination is in the child's best interests before it can terminate parental rights." *In re*

*Olive/Metts*, 297 Mich App 35, 40; 823 NW2d 144 (2012) (citations omitted). The minor child—not the parent—is the focus of the best-interest stage. *In re Moss*, 301 Mich App 76, 87; 836 NW2d 182 (2013). In making its determination, the trial court may consider factors such as "the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home." *Olive/Metts*, 297 Mich App at 41-42 (internal citations omitted). "[W]hether termination of parental rights is in the best interests of the child must be proven by a preponderance of the evidence." *Moss*, 301 Mich App at 90. This Court reviews the trial court's decision regarding the children's best interests for clear error. *In re White*, 303 Mich App 701, 713; 846 NW2d 61 (2014).

Here, respondent relapsed into drug use shortly after his previous 2012 case closed. His drug use led to the children being unsupervised and two of them wandering alone outside the home, while the other child was unsupervised with the front door wide open. Haugen testified that respondent's psychological evaluation did not change much since his 2012 case. Haugen opined that respondent's potential for rehabilitation was poor and that respondent was very prone to relapse. Wine testified that she did not observe an emotional connection between respondent and the children and that respondent was not very involved during parenting time. Moreover, Wine testified that the children's behavior improved while they were in the care of their maternal grandparents. As the trial court reasoned, each child, individually, deserved stability, permanence, and supervision not clouded by drug use. While respondent argues that he loves his children and that there was a bond between them, this bond does not outweigh each child's need for permanence, stability, and proper care. See *In re LE*, 278 Mich App 1, 29-30; 747 NW2d 883 (2008). Given respondent's drug use, his history and potential for relapse, and the children's need for stability and proper care, the trial court did not clearly err in finding that termination was individually in each of the children's best interests. *Moss*, 301 Mich App at 90.

Affirmed.

/s/ Jane E. Markey
/s/ Donald S. Owens
/s/ Mark T. Boonstra