# STATE OF MICHIGAN

# COURT OF APPEALS

In re K. E. MCGEE, Minor.

UNPUBLISHED
June 23, 2016

No. 330538
Wayne Circuit Court
Family Division
LC No. 13-514970-NA

Before: METER, P.J., and SHAPIRO and O'BRIEN, JJ.

PER CURIAM.

Respondent appeals as of right the trial court's order terminating her parental rights to her one-year-old son, KEM, pursuant to MCL 712A.19b(3)(c)(*i*), (g), and (j). We affirm.

Respondent complains that the circuit court erred in finding sufficient evidence to establish a statutory ground for termination under MCL 712A.19b(3) and in finding that termination of her parental rights was in the child's best interests.

The petitioner bears the burden of proving a statutory ground for termination by clear and convincing evidence. MCL 712A.19b(3); *In re Trejo*, 462 Mich 341, 350; 612 NW2d 407 (2000). Once the petitioner has proven a statutory ground, the circuit court must order termination if "termination of parental rights is in the child's best interests . . . ." MCL 712A.19b(5). We review for clear error a circuit court's decision to terminate parental rights. MCR 3.977(K). The clear error standard controls our review of "both the court's decision that a ground for termination has been proven by clear and convincing evidence and . . . the court's decision regarding the child's best interest." *In re Trejo*, 462 Mich at 356-357. A decision qualifies as clearly erroneous when, although there may be evidence to support it, "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been made." *In re JK*, 468 Mich 202, 209-210; 661 NW2d 216 (2003). Clear error signifies a decision that strikes this Court as more than just maybe or probably wrong. *In re Trejo*, 462 Mich at 356. We "give deference to the trial court's special opportunity to judge the credibility of the witnesses." *In re HRC*, 286 Mich App 444, 459; 781 NW2d 105 (2009).

A circuit court may order termination of parental rights under MCL 712A.19b(3)(c)(*i*) if

> [t]he parent was a respondent in a proceeding brought under this chapter, 182 or more days have elapsed since the issuance of an initial dispositional order, and the court, by clear and convincing evidence, finds either of the following:

-1-

(*i*)    The conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.

Approximately a year had elapsed between the circuit court's entry of an initial dispositional order and the close of the termination hearing on November 20, 2015.  On October 24, 2014, respondent pleaded no contest to allegations that KEM's older brother, KMM, had been placed in foster care because respondent left him alone in a homeless shelter and she had not achieved her treatment goals.  At a dispositional hearing in November 2014, the circuit court ordered respondent to complete the elements of her treatment plan involving KMM,[1] receive assistance from a parent partner, complete intensive parenting classes, and have closely supervised parenting time with KEM.

Clear and convincing evidence demonstrated that the conditions leading to KEM's October 2014 adjudication continued to exist in November 2015, with no reasonable likelihood of being rectified within a reasonable time.  Respondent completed two parenting classes, interacted with a parenting coach, attended supervised parenting sessions with KEM, underwent psychiatric and psychological evaluations, and attended counseling, including to address anger management.  However, respondent did not verify the existence of an adequate source of income to care for KEM.  Respondent also failed to demonstrate adequate or consistent improvement in her mental health or parenting skills.

Jayla Smith, respondent's foster care worker between November 2013 and July 2014, testified that respondent completed parenting classes, generally communicated with Smith appropriately, and attended individual therapy and parenting sessions.  However, in 2014, after KMM was placed with his father, Gregory Moore, respondent repeatedly and falsely accused Smith and a Children's Protective Services (CPS) worker of engaging in inappropriate relationships with Moore, alleged that Smith had lied and planned to terminate respondent's parental rights, and (in July 2014) threatened "to cut into" Smith.

Sherita Hopkins, who had worked as respondent's parent partner since December 2014, testified that she and respondent mostly worked well together.  Hopkins never saw respondent become physically aggressive.  However, Hopkins remembered several instances when respondent combatively expressed herself verbally, including in a courtroom two or three times, with her caseworker three or four times, and at a post office.

Belinda Edwards testified that she counseled respondent approximately 14 times between June 2014 and September 2014.  Respondent's therapy goals included maintaining emotional stability, working through issues of domestic violence, controlling feelings and behavior, and

---

[1] In December 2013, the circuit court ordered that respondent receive assistance from a parent partner, attend psychological and psychiatric evaluations, complete parenting classes, participate in therapy, and attend supervised parenting sessions.  The circuit court later ordered that respondent participate in anger-management classes.

understanding the consequences of abandoning KMM. Before KEM's birth in August 2014, Edwards indicated, the counseling had gone extremely well. Respondent frequently contacted Edwards, and she demonstrated improved behaviors. However, after KEM's birth, respondent's progress stalled; she became hostile and irate toward Edwards.

Since shortly before KEM's birth, Laurie Webber was respondent's caseworker. Webber detailed at the hearing instances when respondent became irritated with Webber and yelled and swore at Webber. Webber also testified that she felt concerned about respondent's prolonged inability to improve her parenting of KMM and KEM. On September 11, 2014, Webber ended a parenting session after 20 minutes because respondent refused to acknowledge the children's presence. On October 2, 2014, respondent repeatedly grabbed KMM and asked Webber if he had to be there. On October 30, 2014, after KMM hit respondent, respondent grabbed KMM's arm and warned KMM that he should stop hurting respondent or she would hurt him "like this," asking him if it hurt. When Webber intervened, respondent grabbed one of KMM's toes and asked whether that hurt. On December 4, 2014, respondent became irritated after finding a small spot of eczema on KEM's face, became angry with KEM's crying, tried untying KMM's belt while holding KEM, allowed KEM to slide so that "his head point[ed] toward the ground and he was crying," and ignored Webber's offer to hold KEM by yelling, "You're not touching my baby." Webber asked KMM to leave a bathroom stall so she could help undo the belt, and respondent grabbed KMM's arm and "yanked him back into the stall." On January 12, 2015, respondent became angry at KMM, yelled at him, picked him up, threw him onto a couch, ignored offers of parenting assistance, picked up KMM again and slammed him down on the couch, and sat on KMM's legs. Webber pulled KMM from underneath respondent, and respondent screamed "at the top of her lungs at KMM asking . . . what was wrong with him." On June 29, 2015, KMM kicked respondent and for approximately 30 minutes she physically restrained KMM until someone intervened.

Webber concluded that despite respondent's participation in two parenting classes, anger-management classes, and therapy, and her receipt of assistance from a parenting coach, respondent still presented "a significant risk to her children based on" her physical and punitive discipline style. Webber did not believe that any more services would benefit respondent within a reasonable time. She noted that KEM cried during most of the parenting sessions, and KEM's foster parents reported concerns about his behavior after the sessions.

CK, KEM's foster father, testified that in most of his interactions with respondent, she had behaved aggressively and with hostility. In 2014, respondent yelled at CK because she thought he had not properly cared for KEM, and respondent chased CK from a location for supervised parenting sessions. CK noticed that after most parenting sessions, KEM would leave the room upset and crying and sleep poorly, and "for days after he would have . . . little tantrums." After KEM's parenting times with respondent ended, CK noted, KEM was a calmer and generally happy boy.

Monica Wallace, who for approximately a year supervised both foster care workers assigned to respondent's case, confirmed that respondent often had yelled at Smith and had threatened to cut her. After Webber began working with respondent, there were many instances in which respondent yelled at caseworkers. Respondent complained about "whether services were set up timely or appropriately," quickly moved from one topic to another without allowing

a response to her concerns, and often became angry in response to questions from workers. Respondent falsely accused Webber of not showing her how to redirect the children. In 2015, respondent telephoned Wallace, angrily yelled at Wallace, talked over Wallace's efforts to get clarification, and threatened that she intended "to beat the sh*t out of that b**** [Webber]." Wallace opined that Webber had gone "above and beyond" in finding respondent appropriate services that accommodated her scheduling and transportation issues. Although respondent sometimes worked well with service providers, her inability to interact well consistently led Wallace to question whether she could improve her parenting skills in a reasonable time.

Beginning in April 2015, Keeli Lackey coached seven of respondent's parenting sessions. During most of the parenting sessions, respondent properly redirected KMM, who did not always listen to respondent. But Lackey noted concern arising from a June 2015 parenting session, when respondent physically restrained KMM and expressed the desire to keep him restrained for a long period. Lackey stated that KEM cried when he saw respondent during the parenting sessions. Although Lackey opined that respondent had perceptibly improved her parenting skills since the coaching sessions began, including by "spending additional time cuddling and holding" KEM, Lackey had concern about respondent's difficulty listening to professional advice designed to help her.

Webber testified regarding two instances when respondent had threatened to harm her. In September 2015, Webber was informed that respondent had advised petitioner to remove Webber from the case for her safety. In November 2015, respondent's therapist informed Webber about respondent's threat "that if her parental rights were terminated she would not be responsible for what she did. And that she would . . . retaliate."

A decision regarding a reasonable time for improvement "appropriately focuse[s] not only on how long it would take respondent to improve her parenting skills, but also on how long her . . . children could wait for this improvement." *In re Dahms*, 187 Mich App 644, 648; 468 NW2d 315 (1991); see also *In re LE*, 278 Mich App 1, 28; 747 NW2d 883 (2008). Clear and convincing evidence established the unlikelihood that respondent would improve her parenting skills within a reasonable time given KEM's very young age. *In re Dahms*, 187 Mich App at 648; *In re LE*, 278 Mich App at 28. Respondent's questionable ability to parent had existed since November 2013, when she left two-year-old KMM in a homeless shelter. Between November 2013 and August 2014, when petitioner removed KEM from respondent's custody, she had failed to significantly improve her ability to parent, even after participating in a treatment plan (for KMM) similar to the one the circuit court ordered concerning KEM in November 2014. By the time the termination hearing ended in November 2015, respondent had failed to sufficiently improve her parenting skills, despite her participation in services for approximately two years. Young KEM had spent his entire life in foster care, and throughout the supervised parenting sessions with respondent, KEM exhibited emotional distress. The evidence supports the trial court's reliance on MCL 712A.19b(3)(c)(*i*) as a statutory basis for termination.

Pursuant to MCL 712A.19b(3)(g), a circuit court can terminate a respondent's parental rights "if the court finds, by clear and convincing evidence," that "[t]he parent, without regard to intent, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age." Contrary to respondent's contention, the evidence of respondent's

ongoing poor parenting skills and self-induced trouble with caseworkers,[2] and KEM's distress associated with seeing respondent, adequately established her failure to properly care for, protect, and supervise KEM, as well as the unlikelihood that she would rectify her parental shortcomings within a reasonable time in light of KEM's very young age. MCL 712A.19b(3)(g); *In re LE*, 278 Mich App at 28; *In re Dahms*, 187 Mich App at 648.

We also detect no clear error in the circuit court's conclusion that clear and convincing evidence established the likelihood that the child remained at risk of potential emotional or physical harm in respondent's care. A circuit court can terminate parental rights if the record clearly and convincingly establishes that "[t]here is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent." MCL 712A.19b(3)(j). The record clearly and convincingly established that the event precipitating KEM's child protective proceeding involved respondent's abandonment of KMM at a homeless shelter. For approximately two years after the abandonment of KMM, respondent failed to consistently and significantly improve her parenting skills, despite abundant evidence that petitioner supplied respondent with many services. The record also clearly and convincingly proved that KEM's parenting sessions with respondent had caused him substantial emotional distress. *In re Hudson*, 294 Mich App 261, 268; 817 NW2d 115 (2011) (explaining that the risk of harm to children includes both potential emotional and physical harm). The evidence supports the trial court's reliance on MCL 712A.19b(3)(j) as an additional statutory basis for termination.

"Even if the trial court finds that the [petitioner] has established a ground for termination by clear and convincing evidence, it cannot terminate the parent's parental rights unless it also finds by a preponderance of the evidence that termination is in the best interests of the children. MCL 712A.19b(5)." *In re Gonzales/Martinez*, 310 Mich App 426, 434; 871 NW2d 868 (2015). In *In re White*, 303 Mich App 701, 713; 846 NW2d 61 (2014), this Court stated:

> The trial court should weigh all the evidence available to determine the children's best interests. To determine whether termination of parental rights is in a child's best interests, the court should consider a wide variety of factors that may include the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability and finality, and the advantages of a foster home over the parent's home. The trial court may also consider a parent's history of domestic violence, the parent's compliance with his or her case service plan, the parent's visitation history with the child, the children's well-being while in care, and the possibility of adoption. [Citation and quotation marks omitted.]

The circuit court committed no clear error in finding that termination of respondent's parental rights served KEM's best interests. Respondent testified that she loved KEM. However, ample hearing testimony established that KEM routinely cried on seeing respondent

---

[2] It was important for respondent to get along with the caseworkers in order to improve her parenting skills and rectify her various issues.

and that after the parenting sessions he routinely had emotional difficulty in the foster home. Even after participating in parenting classes, parental coaching, and other appropriate services, respondent demonstrated inconsistent and insubstantial improvement in her ability to supervise KEM. KEM had spent his entire life in foster care and had strong needs for finality, permanency, and stability. KEM's emotional difficulties in his foster home ceased when parenting sessions with respondent concluded, and his foster parents expressed willingness to adopt him. The trial court did not clearly err in finding that termination of respondent's parental rights was in KEM's best interests.

Affirmed.


/s/ Patrick M. Meter
/s/ Douglas B. Shapiro
/s/ Colleen A. O'Brien