# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* TOWNSEND/LOUCKS, Minors.

UNPUBLISHED
September 27, 2016

No. 331686
Oakland Circuit Court
Family Division
LC No. 15-834763-NA

Before: BORRELLO, P.J., and MARKEY and RIORDAN, JJ.

PER CURIAM.

Respondent-mother[1] appeals as of right a circuit court order terminating her parental rights to the minor children, all of whom have special needs, pursuant to MCL 712A.19b(3)(g), (j), and (m).[2] We affirm.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

This family's history with the Department of Health and Human Services ("DHHS")[3] dates back to 2007.[4] Between 2007 and 2015, DHHS investigated 26 referrals. Three of the referrals were classified as "moderate risk," while the rest were opened as "high risk" cases. Notably, six of those referrals required that DHHS provide respondent with services. Substantiated cases included charges of physical abuse and medical neglect. In one instance,

---

[1] During the termination proceedings, the children's father voluntarily released his parental rights, and he is not a party to this appeal. Thus, we will refer to respondent-mother as "respondent" in this opinion. Where relevant, we will refer to the child's father as respondent-father and both parents jointly as "respondents."

[2] Respondent asserts that her parental rights were terminated pursuant to MCL 712A.19b(3)(b)(*i*), (g), and (j). However, respondent entered a plea of no contest to the statutory bases for termination, and the allegations in the first amended petition provided the factual basis for the plea. The first amended petition sought termination of her parental rights pursuant to MCL 712A.19b(3)(g), (j), and (m).

[3] References to DHHS include its predecessor, the Department of Human Services ("DHS").

[4] Respondent voluntarily released her parental rights to her oldest child in 2005 after neglect proceedings were initiated in Oregon.

respondent's daughter, who weighed approximately six pounds at birth, required hospitalization because she weighed only four pounds when she was three months old.

In August 2015, Child Protective Services ("CPS") investigated yet another neglect referral. Caseworkers visited respondent's home on September 1, 2015, discovering that the family was living in deplorable conditions. The photographs contained in the lower court file depict a home that appears uninhabitable. The carpet was extremely soiled and littered with food and other debris. Food, clothes, garbage, and bags of trash were strewn throughout the house. There were holes in the walls, cracked plaster, and exposed electrical wiring. Additionally, bees and flies were present in one of the children's bedrooms because the window was broken. The youngest child's Pack 'n Play, which doubled as a crib, was filled with items, and there were no sheets on the other children's mattresses. The children were dirty and inappropriately dressed. A CPS supervisor testified that "[t]he home was very chaotic," and "[t]here was no control of the children." She recollected that one of the children crawled into a broken stove while the caseworkers were visiting the home, prompting her to redirect the child when respondent failed to do so.

CPS immediately implemented a safety plan for the family, under which respondent was precluded from staying in the home with the children. The family was checked into a hotel, where they were supposed to remain for the immediate future. DHHS intended to file a petition for removal the following morning.

DHHS filed a petition seeking custody of the children early in the morning on September 2, 2015. Later that day, the trial court entered an interim order authorizing DHHS to immediately take the children into protective custody.

However, by 11:30 a.m., respondent had checked out of the hotel. Then, while she and the children were driving, her oldest son began to have an asthma attack in the car. Respondent decided to stop at a friend's home so that they could eat lunch and her son could receive a breathing treatment. According to respondent, the friend's home was the closest location where they could stop, but the friend was the subject of an open CPS case, which had resulted in the removal of her children, and her home contained many asthma triggers, including smokers, dogs, and dirt. When the breathing treatment proved unsuccessful, respondent called the doctor and left with the children to go to the hospital. She ultimately called 911 as they were driving, but her son died in the car en route. Bronchial asthma with complications was determined to be his cause of death. DHHS subsequently discovered that respondent's son should have been taking preventative medication in addition to using a rescue inhaler at the time of the fatal asthma attack. Further inquiry revealed that respondent had neglected to refill two of her son's prescriptions. As a result, her son was not taking the appropriate medication when he died.

Later in the day on September 2, 2015, the rest of respondent's children were removed from her care. Ultimately, respondent's remaining son was placed with a distant cousin who had experience caring for autistic children, and her daughters were placed with their paternal grandmother.

During the initial preliminary hearing on September 3, 2015, DHHS moved to amend the petition in order to pursue termination of respondent's parental rights. The trial court authorized an amended petition seeking termination of respondent's parental rights on September 10, 2015.[5]

At the November 3, 2015 pretrial hearing, respondent pleaded no contest to the trial court's exercise of jurisdiction over the children pursuant to MCL 712A.2(b) and the statutory grounds for termination of her parental rights. The first amended petition served as the factual basis of her plea. Thereafter, a best-interest hearing was scheduled, and the court ordered a psychological evaluation for respondent and her oldest child, Kadence.

In the meantime, respondent married a man whom she originally met as an adolescent. He came back into her life approximately a month before the children were removed from her care. At the time, he had a criminal history and was receiving treatment for heroin use.

At the end of a two-day best-interest hearing, the trial court issued an oral opinion from the bench, finding that termination of respondent's parental rights was in the children's best interests. The court noted that while in respondent's care, the children lived in squalor, like feral animals, with no parenting. It concluded that the chronic neglect had adversely affected the children, as exhibited by their anger, hyperactivity, and developmental delays. Additionally, the court found that the children, with their special needs, required permanency, stability, and finality. Consistent with its opinion from the bench, the trial court issued a written order terminating respondent's parental rights on February 8, 2016.

## II. ADEQUACY OF SERVICES

Respondent argues that DHHS failed to make reasonable efforts "to protect [her] due process rights prior to termination" because it did not provide appropriate services in light of her "mental deficiencies."[6] We conclude that respondent is not entitled to challenge the propriety of the services offered on a variety of grounds.

## A. ISSUE PRESERVATION/WAIVER

---

[5] Another amended petition was filed on September 17, 2015. The amendments only related to respondent-father.

[6] Later in her brief, respondent appears to argue that she has "learning disabilities" that constitute "mental disorders" as well as "some mental health issues." It is noteworthy that the psychologist who examined respondent identified no cognitive deficiencies or delays, although she noted that respondent did not remember some pieces of information. She only perceived potential emotional issues, characterized by a "dependence on other people." Given this fact, as well as the rest of the record, we conclude that this case is distinct from one involving "a parent with a known or suspected intellectual, cognitive, or developmental impairment," in which "neither the court nor the DHHS may sit back and wait for the parent to assert his or her right to reasonable accommodations." *In re Hicks/Brown,* ___ Mich App ___; ___ NW2d___ (2016) (Docket No. 328870); slip op at 16.

Although respondent has not referenced the Americans with Disabilities Act ("ADA"), 42 USC 12101 *et seq.*, in her brief on appeal,[7] she is essentially arguing that she was entitled to reasonable accommodation, which is provided for under the ADA. In *In re Terry,* 240 Mich App 14, 25; 610 NW2d 563 (2000), this Court held that "the ADA does require a public agency such as the Family Independence Agency (FIA) [now DHHS] to make reasonable accommodations for those individual with disabilities so that all persons may receive the benefits of public programs and services." Thus, "the reunification services and programs provided by the FIA must comply with the ADA." *Id.* However, the Court further noted:

> Any claim that the FIA is violating the ADA must be raised in a timely manner . . . so that any reasonable accommodations can be made. Accordingly, if a parent believes that the FIA is unreasonably refusing to accommodate a disability, the parent should claim a violation of her rights under the ADA, either when a service plan is adopted or soon afterward. The Court may then address the parent's claim under the ADA. Where a disabled person fails to make a timely claim that the services provided are inadequate to her particular needs, she may not argue that the petitioner failed to comply with the ADA at a dispositional hearing regarding whether to terminate her parental rights. [*Id.* at 26.]

In light of these principles, this Court concluded in *In re Terry* that the respondent had *waived* the right to raise an issue regarding the failure to accommodate. *Id.* at 26 n 5. However, in *In re Frey,* 297 Mich App 242; 824 NW2d 569 (2012), this Court determined that the issue was one of preservation, stating that " '[t]he time of asserting the need for accommodation in services is when the court adopts a service plan,' " and noting that the respondents in that case "failed to object or indicate that the services provided to them were somehow inadequate, thereby failing to preserve this issue." See also *In re Hicks/Brown,* ___ Mich App ___, ___; ___ NW2d___ (2016) (Docket No. 328870); slip op at 9 (identifying the issue as one of preservation).[8]

Nonetheless, the same conclusion results in this case whether we analyze this issue in terms of whether respondent adequately *preserved* this issue for appeal or *waived* this issue below. Respondent did not challenge the services offered or the purported lack of accommodation until her closing argument at the best-interest hearing. Under these circumstances, respondent's challenge was untimely. Accordingly, she is not entitled to raise on appeal a challenge to the adequacy of the services or accommodations offered by DHHS.

## B. RESPONDENT'S NO CONTEST PLEA

---

[7] Respondent argued the application of the ADA in her closing argument at the best-interest hearing.

[8] In *In re Hicks/Brown,* ___ Mich App at ___; slip op at 10, this Court stated, in dicta, "[T]he introduction of waiver principles is misplaced because a parent who raises such an objection 'is not attempting to litigate the violation [of the ADA] in family court;' rather, the parent is challenging the evidentiary support for the termination." (Citation omitted.)

Alternatively, respondent effectively waived this issue by entering a no contest plea to the statutory grounds for termination alleged in the amended petition.

Asserting a failure to accommodate is inextricably intertwined with DHHS's duty to make reasonable efforts to facilitate reunification. In *In re Terry,* 240 Mich App at 26, the Court noted that "if the [DHHS] fails to take into account the parents' limitations or disabilities and make any reasonable accommodations, then it cannot be found that reasonable efforts were made to reunite the family." Thus, when a respondent raises a failure to accommodate, she is, in effect, challenging whether DHHS made reasonable efforts to facilitate reunification. See also *In re Hicks/Brown,* ___ Mich App at ___. However, a contention that reasonable services were not offered ultimately relates to the sufficiency of the evidence supporting termination of parental rights. *In re Fried,* 266 Mich App 535, 541; 702 NW2d 192 (2005). See also *In re Hicks/Brown,* ___ Mich App at ___; slip op at 6 ("The reasonableness of the efforts provided affects the sufficiency of the evidence supporting the grounds for termination."); *id.* at ___; slip op at 10 (stating that a respondent who raises an objection on the basis of reasonable services or accommodations is challenging the evidentiary support for termination). Accordingly, because respondent's challenge to the quality of services provided is ultimately an attack on the sufficiency of the evidence offered in support of termination of her parental rights, respondent's no contest plea to the allegations in the petition constitutes a waiver of this challenge. Cf. *In re Hudson,* 294 Mich App 261, 264; 817 NW2d 115 (2011) (stating that a respondent who pleads no contest to the allegations in a petition has waived the right to challenge on appeal the sufficiency of the evidence that was offered in support of termination); *Terry,* 240 Mich App at 26 n 5.

## C. ADDITIONAL GROUNDS

Furthermore, respondent was not entitled to receive additional services in this case because DHHS "is not required to provide reunification services when termination of parental rights is the agency's goal." *In re HRC,* 286 Mich App 444, 463; 781 NW2d 105 (2009); see also MCR 3.977(E). Here, because DHHS sought termination at the initial dispositional hearing, it was not required to make reasonable efforts toward reunification. *In re HRC,* 286 Mich App at 463. Nevertheless, even if DHHS was required to continue to make reasonable efforts for reunification pursuant to the court's orders, and even if we assume that respondent is entitled to raise this challenge on appeal,[9] the record demonstrates that (1) DHHS previously expended extensive efforts to rectify the circumstances giving rise to the numerous CPS investigations, and (2) services in addition to those already provided were not reasonable under the circumstances

---

[9] "In general, when a child is removed from the parents' custody, the petitioner is required to make reasonable efforts to rectify the conditions that caused the child's removal by adopting a service plan." *In re Fried,* 266 Mich App at 542, citing MCL 712A.18f(1), (2), and (4); see also *In re LE,* 278 Mich App 1, 18; 747 NW2d 883 (2008). When the petitioner fails to offer services or provide a reasonable opportunity for a respondent to participate in services, the result is a gap in the evidentiary record that renders termination of parental rights improper. *In re Mason,* 486 Mich 142, 158-160; 782 NW2d 747 (2010).

given respondent's lack of improvement from the previous efforts and the fact that DHHS had provided the most exhaustive services that it could offer.

Respondent was repeatedly offered services in conjunction with the numerous CPS cases that were opened between 2007 and 2015 in light of substantiated allegations of abuse and neglect. She asserts on appeal that DHHS was required to provide additional accommodations, as she needed "assistance beyond being given a phone number to call or a letter to follow up on." However, the CPS supervisor testified, and respondent reported during her psychological examination, that she had been offered intensive *in-home services* through Families First, Early On, Wraparound, and Families Together Building Solutions. Some of the in-home service providers facilitated additional services outside the home, but respondent declined these services. A CPS supervisor expressly confirmed that respondent had been offered the most intensive services that DHHS could provide. Nevertheless, even though respondent completed Families First and was in the process of completing Families Together Building Solutions in August and September 2015, the petition for removal was filed in light of her lack of cooperation, her unwillingness to let CPS caseworkers inside the house, and the caseworkers' subsequent observations of the home.

Further, it is significant that respondent expressly testified at the best-interest hearing that she rejected multiple services throughout her history with CPS, believing that they were "more of a hindrance," and only participated in services that she personally believed were beneficial.[10] A CPS supervisor similarly testified that respondent had declined services on multiple occasions, telling caseworkers that she did not want strangers in her home or that she was unwilling to participate in some services. Respondent also told the psychologist who performed her psychological evaluation that she believed that she needed no treatment apart from grief therapy. She indicated that she did not "trust some of the people" and expressed a belief that some of the services were inappropriate, as "they wanted her to do parenting classes," while she believed that she needed more help with her finances and obtaining a car than with her parenting skills. Additionally, respondent told the psychologist that she was previously diagnosed with bipolar disorder, but she stated that she disagreed with the diagnosis and did not believe that she needed treatment for it.

"While the DH[H]S has a responsibility to expend reasonable efforts to provide services to secure reunification in most cases, there exists a commensurate responsibility on the part of respondents to participate in the services that are offered." *In re Frey*, 297 Mich App 242, 248; 824 NW2d 569 (2012). When a respondent fails to adequately participate in, and benefit from, services that are in fact provided by petitioner, she is not entitled to claim that petitioner was required to provide additional services. See *id*.

## III. BEST INTERESTS

_____

[10] However, according to respondent, no one explained the potential benefits of offered services.

Next, respondent argues that the trial court clearly erred when it found that termination of her parental rights was in the best interests of the children, maintaining that she should have been provided additional time to work toward reunification. We disagree.

## A. STANDARD OF REVIEW AND APPLICABLE LAW

Pursuant to MCL 712A.19b(5), "[t]he trial court must order the parent's rights terminated if the [DHHS] has established a statutory ground for termination by clear and convincing evidence and it finds from a preponderance of the evidence on the whole record that termination is in the children's best interests." *In re White*, 303 Mich App 701, 713; 846 NW2d 61 (2014). We review for clear error a trial court's best-interest determination. *Id.*, citing MCR 3.977(K).

"[W]hether termination of parental rights is in the best interests of the child must be proved by a preponderance of the evidence." *In re Moss*, 301 Mich App 76, 90; 836 NW2d 182 (2013).

> To determine whether termination of parental rights is in a child's best interests, the court should consider a wide variety of factors that may include "the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home." The trial court may also consider a parent's history of domestic violence, the parent's compliance with his or her case service plan, the parent's visitation history with the child, the children's well-being while in care, and the possibility of adoption. [*White*, 303 Mich App at 713-714 (footnotes omitted); see also *In re Olive/Metts Minors*, 297 Mich App 35, 41-42; 823 NW2d 144 (2012).]

Further, among other things, a court may consider a parent's "unfavorable psychological evaluation," the children's ages, and the parent's history. See *In re Jones*, 286 Mich App 126, 129; 777 NW2d 728 (2009).

## B. ANALYSIS

When the children were removed from respondent's care, they were living in squalor and chaos. The severity of the neglect that precipitated their removal is exposed by the photos admitted at the best-interest hearing, which depict a home that was unfit for human habitation. Although respondent had a history with CPS that spanned nearly a decade, the family did not come to the court's attention until 2015. During her interactions with CPS, respondent would make progress when she received a staggering amount of support, but she would revert to her previous patterns of child neglect when that support faded. As a CPS supervisor testified, the family's history consisted of a cycle of opened and closed CPS cases. There is nothing in the record suggesting that a different pattern would result if respondent were given another opportunity to parent her children in this case.

All of the children at issue in the petition were under the age of 10 at the time of the best-interest hearing. The youngest child had recently turned two years old. Each of them has special needs. The clinical psychologist emphasized that children with special needs require more stability and structure than the average child, and the evidence in the lower court record confirms that the children's current placements were providing the stability and permanency that they

needed. The children were thriving under the care of their paternal grandmother and a distant cousin, meeting milestones and progressing in school. Additionally, their caregivers had expressed a commitment to permanently plan for the children in their care.

In contrast, it is readily apparent that respondent was not in a position to provide a safe and stable environment for her special needs children. At the time of the best-interest hearing, respondent had been unemployed for more than 10 years and was financially dependent on her husband. They were living in a hotel because they could not afford anything more permanent, as the couple's only source of income was the money earned by respondent's husband through occasional odd jobs "here and there." Although respondent testified on her own behalf, she never articulated a feasible path for reunification with her children.

Moreover, it is clear that respondent lacked the ability to safely parent her children. A relative reported that respondent had left her children in car seats for extended periods of time without being fed, and that respondent would have to be reminded to feed, change, and dress the children appropriately. School employees reported, among other things, that the children were unbathed, that they wore clothes that did not fit or were inappropriate for the weather, and that the children's feet were brown from not wearing shoes and socks. There had been reports that respondent would lay her youngest child on the ground and place food, such as chips, around her, or feed the children by dumping a can of ravioli on a picnic table for them to pick at. Both a neighbor and a relative reported that when her autistic son wandered from the home, respondent would follow her son in the car and "bump" him with the vehicle to redirect him to the house, although respondent denied this claim. CPS also received reports that the children would go outside or leave the home without supervision.

Further, the record shows that respondent would not be in a position to provide a stable environment for her children in the foreseeable future. The clinical psychologist noted that respondent had not benefited from the services that had been offered, that she lacked insight into the needs of her children, and that she refused to participate in services based on her personal belief that the services would not be helpful. Notably, respondent candidly admitted at the best-interest hearing that she would not be in a position to safely parent her children for at least another year. There also was ample evidence that respondent continued to exercise poor judgment and make poor decisions. In the midst of the termination proceedings, she married a man who had returned to her life in the month before the children were removed, even though she had known him since the age of 11. Notably, this man had a criminal history, which included a domestic violence conviction, and was currently receiving treatment for heroin abuse. These facts demonstrate respondent's ongoing lack of judgment, reveal that she is unable to put her children's needs above her own, and confirm that she did not benefit from the services offered over the many years that she was involved with CPS, to the extent that she actually participated.

On this record, the trial court did not clearly err when it concluded that termination of respondent's parental rights was in the children's best interests. The special needs children were entitled to the stability and permanence required to facilitate their continued growth and development.

IV. CONCLUSION

Respondent is not entitled to challenge on appeal the level of services and accommodations provided by DHHS. Additionally, the trial court did not clearly err in concluding that termination of respondent's parental rights was in the best interests of the children.

Affirmed.

/s/ Stephen L. Borrello
/s/ Jane E. Markey
/s/ Michael J. Riordan