# STATE OF MICHIGAN

# COURT OF APPEALS

In re BLAKE/GOFF, Minors.

UNPUBLISHED
October 11, 2018

No. 342895
Monroe Circuit Court
Family Division
LC No. 17-024325-NA

In re GOFF, Minors.

No. 342896
Monroe Circuit Court
Family Division
LC No. 17-024325-NA

Before: JANSEN, P.J., and METER and STEPHENS, JJ.

PER CURIAM.

In these consolidated appeals, respondent-mother and respondent-father each appeal as of right the trial court's order terminating their parental rights to minor children. The trial court terminated respondent-mother's parental rights to DB, ZG, and RG pursuant to MCL 712A.19b(3)(b)(*ii*) and (j) and terminated respondent-father's parental rights to ZG and RG pursuant to MCL 712A.19b(3)(b)(*i*), (j), (k)(*ii*), and (k)(*ix*). We affirm.

Respondents have two children between them, ZG and RG. Respondent-mother also has an older minor daughter, DB, and an adult daughter, MB. Although events transpiring in October 2017 culminated in the termination of respondents' parental rights in March 2018, respondents have a previous history with Child Protective Services (CPS) that precedes the October 2017 events.

Respondents met in Mississippi, and respondent-father eventually moved into the home of respondent-mother and her daughters MB and DB. Respondent-mother gave birth to ZG in 2009. Respondents married in 2010, and RG was born in 2012.

In 2014, when she was approximately 14 years old, MB disclosed to respondent-mother her belief that respondent-father had touched her inappropriately. However, because the alleged inappropriate contact occurred while she was sleeping, MB added that it was possible that she

-1-

dreamed the whole thing. At the time of MB's disclosure, respondent-mother was aware that several years earlier respondent-father had been accused of inappropriately touching SS, a stepdaughter from a previous marriage. Apparently respondent-mother was concerned enough about MB's disclosure that she contacted respondent-father's ex-wife to inquire about SS's experience with respondent-father. Respondent-mother claimed that the ex-wife told her that SS's accusations were untrue. Consequently, respondent-mother did not report MB's accusations to anyone. However, respondent-father's ex-wife contacted Mississippi's child protection services and a Mississippi CPS case was opened.

Respondent-father was ordered to move out of the house and a Mississippi court directed the family to participate in services. Three months later, respondent-mother allowed respondent-father to return to the home, in violation of the court's orders. As a result, Mississippi CPS removed MB from respondent-mother's care and the child was placed with her biological father. Thereafter, instead of participating in services, respondents left MB in Mississippi, took the younger children, and relocated to Toledo, Ohio, and then eventually to Michigan.

In the ensuing years, respondent-mother's physical and emotional condition deteriorated. Respondent-mother, a war veteran, testified that she suffered from post-traumatic stress disorder (PTSD) related to her deployment to Iraq. Respondent-mother tried prescription drugs, but she eventually resorted to alcohol consumption to cope with her PTSD. Respondent-mother admitted to drinking alcohol every day. Because of her excessive alcohol consumption, respondent-mother developed chronic pancreatitis and was rendered disabled, and respondent-father became her full-time, paid caregiver. Respondent-mother's medical conditions required a multitude of drugs and frequent hospitalizations. Respondent-mother understood that she should not drink, that alcohol consumption worsened her pancreatitis, and that she risked death from continued consumption. Nonetheless, respondent-mother continued to abuse alcohol.

In 2017, respondent-mother was hospitalized for a total of 30 days. During these periods, the children were often left in respondent-father's care. Then-15-year-old DB frequently assumed responsibility for taking care of the needs of her younger siblings.

In September 2017, respondent-mother was hospitalized. At one point, doctors placed her in a medically-induced coma and her condition was critical. Consequently, DB, ZG, and RG were left in respondent-father's care. DB testified that in early October 2017, respondent-father tied her legs to the foot of the bed, tied her hands together, placed a rolled-up sock in her mouth, and then sexually penetrated her vagina with his fingers and a small vibrator and "put . . . his lips on [her] vagina." At some point that day, DB called the police. The responding officer went through the home to locate DB's younger siblings. The officer saw two neckties tied around the foot of a bed. He also noticed balled-up socks and a strip of fabric lying on the bed. The officer saw a bottle of alcohol on the dresser and prescription-pill bottles on a bookshelf; they were within the reach of a child. The condition of the rest of the house was concerning, as well. A litter of kittens were walking in and out of a bathroom sink. Animal waste was present on the floor and in a bathtub. Two dogs were crated in the kitchen. Urine and feces were pooled on the floor near the crates. Old food was left on the counter. There was also an odor in the home.

Because neither parent was available, and no adult had been given the legal authority to care for the children, the children were removed from the home and then placed in protective

custody. Respondent-father admitted to a CPS worker that he had tied DB's feet together with neckties because she was kicking things all over the room. Another CPS worker heard respondent-father admit that he tied each leg separately to either end of the bed. Respondent-father explained that DB had refused to pick up some shoes and so he "smack[ed]" her. He claimed that DB was only briefly tied up. Indeed, he avowed that the time it took to untie the knots was longer in duration than the time DB was actually tied up. Respondent-father explained to the CPS worker that he fled from the house after the police appeared because he was concerned that he would be arrested.

On October 31, 2017, a supplemental petition was filed requesting that the court take jurisdiction over the children and terminate respondents' parental rights at the initial disposition. At the hearing, shortly after the first witness was called, the court's bailiff noticed a strong smell of alcohol in the courtroom. Respondent-mother acknowledged that she had been drinking and explained that she had consumed alcohol, which was the only way she would have been able to attend the hearing. Respondent-mother further explained that she could not tolerate small spaces and being around people. In an effort to accommodate respondent-mother, the court eventually provided her the opportunity to participate in the hearings from another room using video "polycom" technology.[1] Thereafter, the hearing resumed. The court determined that it could take jurisdiction over the three children. It then found that statutory grounds for terminating respondents' parental rights had been established by clear and convincing evidence and that termination of respondents' parental rights was in the children's best interests.

For his first claim of error, respondent-father argues that the trial court erred by assuming jurisdiction over his two children. We disagree. A trial court may assume jurisdiction over a minor child when it finds by a preponderance of the evidence that a statutory basis for jurisdiction exists. *In re BZ*, 264 Mich App 286, 295; 690 NW2d 505 (2004). We review a trial court's decision to exercise jurisdiction for clear err in light of the court's findings of fact. *Id.* A trial court's findings of fact are "clearly erroneous if the reviewing court is left with a definite and firm conviction that a mistake has been committed, giving due regard to the trial court's special opportunity to observe the witnesses." *Id.* at 296-297.

To establish jurisdiction, the petitioner must prove by a preponderance of the evidence that a statutory basis for jurisdiction exists under MCL 712A.2(b). *In re SLH*, 277 Mich App 662, 669; 747 NW2d 547 (2008). A "preponderance of the evidence" means evidence of a proposition that, when weighed against the evidence opposed to the proposition, "has more convincing force and the greater probability of truth." *People v Cross*, 281 Mich App 737, 740; 760 NW2d 314 (2008). The trial court assumed jurisdiction pursuant to MCL 712A.2(b)(1) and (2), which provide that a court has:

> (b) Jurisdiction in proceedings concerning a juvenile under 18 years of age found within the county:

---

[1] On the last day of the hearing, respondent-mother again appeared under the influence of alcohol. A breathalyzer test indicated that she had a blood-alcohol level of 0.052.

(1) Whose parent or other person legally responsible for the care and maintenance of the juvenile, when able to do so, neglects or refuses to provide proper or necessary support, education, medical, surgical, or other care necessary for his or her health or morals, who is subject to substantial risk of harm to his or her mental well-being, who is abandoned by his or her parents, guardian, or other custodian, or who is without proper custody or guardianship.

* * *

(2) Whose home or environment, by reason of neglect, cruelty, drunkenness, criminality, or depravity on the part of a parent, guardian, nonparent adult, or other custodian, is an unfit place for the juvenile to live in. . . .

Respondent-father argues that petitioner presented insufficient evidence to warrant the court's assumption of jurisdiction over his children. We disagree.

The evidence established that when the police responded to a sexual-assault complaint at the home, respondent-father left the scene. At the time, respondent-mother was hospitalized in a medically-induced coma and respondent-father was the only parent available to care for the children. A CPS worker stated that "there were no friends or family that were willing to take the children that night." While DB routinely cared for her younger siblings, as the victim of a serious sexual assault, she was not adequately available to provide for the children's needs. In addition, DB was only 15 years old at the time, too young to assume responsibility for the children's care beyond a short period, and after the children were removed from the home, no one came forward with any legal authority to provide for the children's needs. Based on this evidence, the trial court did not err when it found that respondent-father left his two children without proper custody or guardianship, and therefore, jurisdiction was proper under MCL 712A.2(b)(1).

There was also sufficient evidence to support the court's exercise of jurisdiction under MCL 712A.2(b)(2). The trial court found that respondent-father sexually abused his children's older sibling. DB testified to the abuse, and her account of the events was corroborated by physical evidence in the home. The trial court found DB to be a credible witness. There was also evidence that respondent-mother abused alcohol to the point that she was incapable of caring for the children. Accordingly, the trial court properly assumed jurisdiction over ZG and RG because these two children were in an unfit home by virtue of the criminality, depravity, and drunkenness occurring within it.

The trial court also properly assumed jurisdiction over ZG and RG under the doctrine of anticipatory neglect. "The doctrine of anticipatory neglect recognizes that how a parent treats one child is certainly probative of how that parent may treat other children." *In re AH*, 245 Mich App 77, 84; 627 NW2d 33 (2001) (quotation marks, brackets, and citations omitted.) A trial court may rely on the doctrine of anticipatory neglect when considering whether it may exercise jurisdiction over a minor child. *In re BZ*, 264 Mich App at 296. While there was no evidence that respondent-father sexually abused ZG and RG at the time the court assumed jurisdiction over them, there was a risk of future harm if they remained in respondent-father's care. Therefore, the court properly assumed jurisdiction over them. See, generally, *id.* at 295-296.

In sum, a preponderance of the evidence demonstrated that respondent-father left his children without proper custody and guardianship. Further, the children's well-being was at risk and their home was unfit. Accordingly, the trial court properly exercised jurisdiction over the children.

Next, both respondents argue that the trial court erred when it found that the statutory grounds for termination were established by clear and convincing evidence. Again, we disagree. To terminate parental rights, the trial court must find that at least one of the statutory grounds for termination in MCL 712A.19b(3) has been established by clear and convincing evidence. *In re BZ*, 264 Mich App at 296. This Court reviews the trial court's findings under the clearly-erroneous standard. MCR 3.977(K).

The court terminated respondent-mother's parental rights to her three children pursuant to MCL 712A.19b(3)(b)(*ii*) and (j). The court terminated respondent-father's parental rights to his two children pursuant to MCL 712A.19b(3)(b)(*i*), (j), (k)(*ii*), and (k)(*ix*). These statutory provisions permit termination of parental rights when the following conditions are satisfied:

> (b) The child or a sibling of the child has suffered physical injury or physical or sexual abuse under 1 or more of the following circumstances:

> (*i*) The parent's act caused the physical injury or physical or sexual abuses and the court finds that there is a reasonable likelihood that the child will suffer from injury or abuse in the foreseeable future if placed in the parent's home.

> (*ii*) The parent who had the opportunity to prevent the physical injury or physical or sexual abuse failed to do so and the court finds that there is a reasonable likelihood that the child will suffer injury or abuse in the foreseeable future if placed in the parent's home.

> \* \* \*

> (j) There is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent.

> (k) The parent abused the child or a sibling of the child and the abuse included 1 or more of the following:

> \* \* \*

> (*ii*) Criminal sexual conduct involving penetration, attempted penetration, or assault with intent to penetrate.

> \* \* \*

> (*ix*) Sexual abuse as that term is defined in section 2 of the child protection law, 1975 PA 238, MCL 722.622.

-5-

After reviewing the record, we conclude that the trial court did not clearly err when it terminated respondents' parental rights under these grounds.

Respondent-father argues that there was no credible evidence that he sexually assaulted DB or that his two biological children, ZG and RG, were at risk of being sexually abused. However, respondent-father ignores that DB testified in great detail to the sexual assault, including that respondent-father bound her hands and feet, placed a rolled-up sock in her mouth, and then penetrated her. The trial court found DB's testimony to be credible. This Court gives deference to the special ability of the trial court to judge the credibility of the witnesses. *In re Miller*, 433 Mich 331, 337; 445 NW2d 161 (1989). Physical evidence in the home also corroborated DB's testimony

Respondent-father's sexual abuse of DB is relevant and probative to whether ZG and RG would be at risk of harm if returned to respondent-father's care. In addition, evidence showed that respondent-father's sexual abuse of DB was part of a pattern of inappropriate sexual misconduct. There was clear and convincing evidence that respondent-father, in the past, had sexually assaulted at least one other stepdaughter. His misconduct with other children was probative of how he may treat his own children. *In re AH*, 245 Mich App at 84.

Despite the credible evidence that respondent-father physically and sexually abused DB, respondent-father has failed to take responsibility for any of his actions. His lack of insight into the nature of his conduct would place all of the children, not just his stepdaughter, at risk of harm if returned to his care. For these reasons, the trial court did not clearly err when it found clear and convincing evidence to terminate respondent-father's parental rights under MCL 712A.19b(3)(b)(*i*), (j), (k)(*ii*), and (k)(*ix*).

With respect to respondent-mother, the evidence was overwhelming that respondent-mother knew or should have known that respondent-father posed a risk of harm to her teenage daughter. Respondent-mother admitted that she knew that respondent-father had been accused of sexual misconduct with his stepdaughter from a prior marriage. Then, in 2014, MB specifically informed respondent-mother that respondent-father had touched her inappropriately. Although respondent-mother discounted this disclosure as the product of MB's dreams, she was sufficiently concerned about the disclosure to contact respondent-father's ex-wife to question her about the prior allegations made by that stepdaughter. Even if respondent-mother had doubts about prior reports of abuse, the evidence was mounting to the point that her doubts were simply unreasonable. Based on this evidence, the trial court did not clearly err in finding that respondent-mother knew, or should have known, that it was not safe to leave DB, or any of her children, in respondent-father's care. Accordingly, clear and convincing evidence supports the trial court's finding that respondent-mother had an opportunity to prevent the sexual abuse yet failed to do so.

Further, clear and convincing evidence supports the trial court's finding that there existed a reasonable likelihood that the children would suffer injury or abuse in the foreseeable future if returned to respondent-mother's home. Respondent-mother refused to acknowledge that respondent-father sexually assaulted DB. She similarly minimized the reporting of prior allegations of misconduct. Respondent-mother had no intentions of separating from respondent-father and she candidly admitted that she would have no concerns about leaving her children in

his care in the future. It is likely that respondent-mother is simply so dependent on respondent-father for her own care that she will do nothing to jeopardize the relationship with her husband, even if that continued relationship exposed or will expose her children to a significant risk of sexual assault. It is readily apparent that respondent-mother will not protect her children from risks of harm when she refuses to even acknowledge that the risk exists.

Further, respondent-mother's own alcohol abuse clearly has impaired her ability to protect her children. Respondent-mother testified that her drinking is "an all-day thing." As a result of her excessive alcohol abuse, she suffers from chronic, life-threatening medical problems. The fairly frequent hospitalizations precipitated respondent-mother's absence from the home and necessitated leaving the children in respondent-father's care. Because of her alcohol abuse, respondent-mother is unavailable to provide adequate care for her children.

There was overwhelming evidence that DB was sexually abused by respondent-father, that respondent-mother had an opportunity to protect her child from the assault yet failed to do so, and that all of the children would be at risk of harm if returned to respondent-mother's care. The trial court did not err when it found clear and convincing evidence to terminate respondent-mother's parental rights to her children.

Finally, respondents challenge the trial court's finding that termination of their parental rights was in the children's best interests. We find no merit to their arguments. "If the court finds that there are grounds for termination of parental rights and that termination of parental rights is in the child's best interests, the court shall order termination of the parental rights and order that additional efforts for reunification of the child with the parent not be made." MCL 712A.19b(5). The court may consider several factors when deciding if termination of parental rights is in a child's best interests, including the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability and finality, and the advantages of a foster home over the parent's home. *In re Olive/Metts,* 297 Mich App 35, 42; 823 NW2d 144 (2012). The court may also consider psychological evaluations, the child's age, continued involvement in domestic violence, and a parent's history. *In re Jones,* 286 Mich App 126, 131; 777 NW2d 728 (2009).

Although there existed a bond between respondent-mother and her children, other factors outweighed the import of that bond. *In re LE,* 278 Mich App 1, 29-30; 747 NW2d 883 (2008). There was overwhelming evidence that respondent-mother was unable and unwilling to protect her teenage daughter from a known risk of harm. Further, there was a significant likelihood of future harm to all of the children. Indeed, respondent-mother had no intentions of severing her relationship with respondent-father and she expressed no concern about leaving the children in his care if they were returned to her home. Under these circumstances, the trial court did not clearly err in finding that termination of respondent-mother's parental rights was in the children's best interests.

With respect to respondent-father, he clearly is a sexual deviant and, consequently, his children would be at risk of harm if returned to his care. Moreover, there was little evidence of a bond between respondent-father and his children. In any event, any bond cannot be elevated to the point where it would outweigh the children's need for safety and security. The trial court did

not clearly err in finding that termination of respondent-father's parental rights was in the children's best interests.

Affirmed.

/s/ Kathleen Jansen
/s/ Patrick M. Meter
/s/ Cynthia Diane Stephens